EXHIBIT 1

# Expert Report by Mark Kantrowitz

**Table of Contents**

Preface ............................................................................................................................. 1

Summary of Conclusions ................................................................................................. 2

Class Members' Reasonable Expectations ...................................................................... 3

Proration ......................................................................................................................... 5

Housing ............................................................................................................................ 6

Meal Plans ....................................................................................................................... 9

Parking ........................................................................................................................... 11

Activity Fee .................................................................................................................... 12

Health Fee ...................................................................................................................... 13

Lab Fees ......................................................................................................................... 14

Materials Fees ............................................................................................................... 15

Course Fees .................................................................................................................... 15

Credits vs. Cash Refunds ............................................................................................... 18

Qualifications ................................................................................................................. 19

Prior Testimony ............................................................................................................. 22

Documents Reviewed .................................................................................................... 22

## Preface

This report summarizes my findings and opinions formed to date concerning the matter of *Carson Little, individually and on behalf of all others similarly situated, v. Grand Canyon University*, Case No. 2:20-cv-00795-PHX-SMB, in the United States District Court for the District of Arizona. More specifically, this report summarizes the student finance information, accounting methods, and calculations that I used to arrive at the amount of refunds due to all students enrolled in on-campus classes at Grand Canyon University ("GCU") for the Spring 2020 semester who were charged and paid fees for services, facilities, resources, activities and/or events that were not provided, in whole or in part, during the Spring 2020 semester ("Class Members").

I reserve the right to supplement and amend my report and opinions to take into account new information learned up to and throughout trial. I am being paid on an hourly basis for this engagement, and my billing rate is $500 per hour.

## Summary of Conclusions

My expert opinion is that Class Members are owed the refunds listed below, and that these refunds must be provided in cash to make Class Members whole. As discussed below, providing refunds as a credit to the students' GCU ledger accounts, as opposed to providing cash refunds, forces students to spend their money within the GCU ecosystem or lose the value, denies students of the ability to use their funds as they choose, and reduces the amount of financial aid students would otherwise receive, and thus does not make students whole.  The opinions expressed in this report are based on my review of documents and information from the lawsuit, my training and experience with respect to finances of higher education, and assumptions as stated in this report.

Throughout this document, I use the term "credit" to refer to an amount of money reflected on the student's ledger account, and "refund" to refer to a repayment of a sum of money in cash to a student.  I use the phrase "Class Members" to mean all members of the Class certified by the Court in this case, *i.e.*, "all students enrolled in on-campus classes at Grand Canyon University ("GCU") for the Spring 2020 semester who were charged and paid fees for services, facilities, resources, activities and/or events that were not provided, in whole or in part, during the Spring 2020 semester."

To calculate the amounts due to the students, I relied on spreadsheets and other documents produced by GCU during discovery. My calculations assume that the documents provided by GCU are based on the most accurate accounting available to GCU, which GCU has confirmed in depositions in this matter. Some of these documents appear to be inaccurate because they seem to be missing students who were owed refunds. For example, two spreadsheets relating to housing refunds do not appear to be aligned, with some information present in one spreadsheet but not the other and vice versa. I calculated a lower bound on the refunds owed to the students based on the information provided in the spreadsheets. In some cases, I was able to calculate a reasonable estimate of the missing information and created a range by adding the estimate to the lower bound. I will review new information as it is received. I reserve the right to supplement and amend these figures to take into account such new information as well as corrections to the GCU documents.

Three spreadsheets provided by GCU in discovery were particularly important to my calculations:

- *GCU-L006598—09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* is a spreadsheet that contains tokenized[1] account charges by GCU relative to all Class Members for the GCU Spring 2020 semester. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 170:4 to 182:9.)

---

[1] "Tokenized" refers to the process whereby students' names were replaced with unique identifiers, known as "Token IDs," (referred to as a "Token_ID" in the various spreadsheets) so that the spreadsheets do not reveal student names. The same unique "Token IDs" were used across various spreadsheets produced by GCU during discovery so that the data can be matched up on a student-by-student basis.

- *GCU-L006599—09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY) is a* spreadsheet that contains tokenized account payments by all Class Members for the GCU Spring 2020 semester. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 228:3-14.)

- *GCU-L006607—iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)* is a spreadsheet that contains tokenized parking fees paid by GCU students in relation to the 2019 through 2020 GCU academic year, which included payments by Class Members in the Spring 2020 semester. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 209:15-20.)

The following list shows the total Class-wide cash refund amounts that I have determined are due to Class Members for each fee category, including room and board, charged to Class Members:

- Housing/Room Fees: $12.13 million to $12.18 million
- Meal Plan Fees: $2,697,319.35 to $4,055,223.95
- Parking Permit Fees: $248,239.70
- Activity Fees: $2,244,383.01
- Health Fees: $478,415.32
- Lab Fees: $246,475.60
- Materials Fees: $1,842,367.78
- Course Fees: $80,988.93

Except for the two items that are presented as estimated ranges, the above amounts are definitive figures that are the results of exact accounting and calculations, as explained in detail below.[2]

The total of the cash refunds listed above that GCU owes to Class Members is $19,969,420.35 to $21,377,324.95.

## Class Members' Reasonable Expectations

When students pay a fee to their college or university they have a reasonable expectation that they will receive something for the fee, namely the products, services, facilities, resources, activities and/or events associated with the fee. It is commonly known in higher education that, where specific student fees are delineated by different categories, a student should believe it to be true that they are paying a fee in order to receive some service, resource, or activity respective to each category as described. The fees that students pay are not an unrestricted gift to the college or university. Rather, the fees are labeled with a specific purpose in mind. This includes fees for housing, meals, parking, student activities, a health center, materials, supplies and equipment. This is part of the agreement and good faith obligation between a college or university and its students.

---

[2] As explained above, the actual owed cash refund amounts may be higher, due to possible errors and omissions in the data provided by GCU.

For example, when students pay an on-campus activity fee each semester, they are entitled to receive some service, resource, or activity in relation to that fee for the entirety of the semester, consistent with the description provided by the school and the norms and practice of the school. This is one of many factors students consider when selecting schools and reviewing their financial obligations and what they can expect to receive in return.

Likewise, when students pay for housing for the semester, they are entitled to stay in the room for the entire semester. When a college or university stops making available the student's housing, for reasons other than student conduct, it must provide a refund to the student.

When resources are eliminated, services are cancelled, or facilities are closed or made unavailable to a student for reasons other than a student ceasing to remain enrolled in the university, the student is entitled to receive full or pro-rata refunds of the fees the student was charged and paid for the associated services, facilities, resources, activities and/or events the student did not receive or have access to. This will make the students whole by compensating them for the benefit that they did not receive. Universities certainly would not allow students to use their services or facilities without paying the required fee, and the reverse is also true: students do not expect to pay for services or facilities that aren't provided.

The reasonable expectation that a student-paid fee covers the cost of a specific product or service (including facilities, resources, activities, and events) is supported by U.S. Department of Education's guidance to college financial aid administrators, of which GCU should have been aware. The U.S. Department of Education's cash management regulations specify that "allowable charges" include "the amount incurred by the student for the payment period for purchasing books, supplies, and other educationally related goods and services provided by the institution for which the institution obtains the student's or parent's authorization." 34 C.F.R. § 668.164(c)(1); this describes institutional charges as paying for specific purchases which the student or parent must be apprised of in advance, and must agree to. The regulations at 34 C.F.R. § 668.41 and 34 C.F.R. § 668.43 require colleges to disclose certain consumer information to the public and to students, including the detailed cost of attending the institution and refund policies, including "other refundable portions of costs paid to the institution." *See also* Mark Kantrowitz, *Defining "Education-Related Expenses"*, Emerging Issues in Financial Aid, Council on Law in Higher Education (CLHE), Volume 1, Number 3, March 24, 2007 (discussing various definitions of education-related expenses in the Higher Education Act of 1965 and the Internal Revenue Code of 1986).

Refunds to students must include, at a minimum, a prorated amount of the fees paid based on the reduction in the amount of time during which the product, facility, resource, activity or service associated with that fee was reasonably available to the students. For example, when Class Members were told by GCU to vacate their campus housing, they should have received a full refund of the prorated housing fee, equivalent to the proportional time remaining in the semester when they were told to go home.   The same principle applies to each of the other GCU on-campus fee categories.

Throughout this report, I explain how I determined the prorated amount of the refunds due to Class Members based on the applicable time period. However, one could also argue that the students should

be entitled to a full refund of all fees paid because GCU did not provide the products and services the students reasonably expected to receive, as the contracts do not provide for proration.

## Proration

In determining the prorated refund amounts owed to Class Members, I used two different proration methodologies, with one set based on the GCU Spring 2020 housing calendar/contract and one set based on the GCU Spring 2020 academic calendar, which have different start and end dates.

Students who paid GCU's Spring 2020 Housing Fee were entitled to live in on-campus housing for the entirety of the Spring 2020 semester, according to the Spring 2020 housing calendar/contract dates. The refund of housing fees should be prorated based on the percentage of days remaining, according to the Spring 2020 housing calendar/contract, and when GCU told students to leave their on-campus GCU housing.

During the GCU Spring 2020 semester, GCU announced that it would provide a housing credit for those students who had moved off campus by the end of the day on March 25, 2020. (*See* 30(b)(6) Deposition of GCU, Designee Tim Griffin, Exhibit No. 4, at GCU-L003091-003093.) This credit did not make Class Members whole because GCU only provided a credit for roughly half of the amount due, it incorrectly calculated the half, and it should have provided a refund instead of a credit. The file *GCU-L002900-Pro Rata Refund COVID-19 Room board fees 2019- 2020*, which shows GCU's calculation of the partial pro-rated housing credits it provided to some students, identifies 109 days in the semester, after excluding 4 days in January and 8 days in April. Of these 109 days, it identifies 31 days (28.44% rounded) in which students were "not on campus."

GCU's calculation is wrong.

First, GCU's calculation appears to be based on the end date of instruction and not on the end date of the housing contract. The end date of the housing contract is later than the last day of instruction, since students were entitled to remain in their on-campus housing during exams, and in some cases graduation, which took place after the last date of instruction. The file *Little Housing Contract Email (PL000346-000348)* reflects a housing contract term of August 26, 2019 through April 25, 2020, confirming the later end date of GCU's Spring 2020 semester housing. Second, GCU's proration calculation also incorrectly assumes that GCU on-campus students moved into their on-campus residences on January 5, 2020; but the move-in date was actually January 4, 2020. Indeed, the GCU University Calendar for Spring 2020,[3] indicates a January 4, 2020 move-in date. As such, GCU's calculation yield an incorrect, reduced proration ratio. Third, GCU rounds down to the nearest multiple of 10 after prorating, to its own benefit and to the detriment of the students.

Based on the above, January 4, 2020, is the correct move-in date, and April 25, 2020, is the correct move-out date. There are a total of 113 days from January 4, 2020 to April 25, 2020, inclusive, and there were

---

[3] Available at page 21 of the Grand Canyon University Policy Handbook 2019-2020 (GCU000033-232).

a total of 34 days that students were not on campus. Accordingly, using the correct dates, the proper proration for housing-related fees should have been 34 of 113 days, or 30.09% rounded.[4]

The 34/113 proration applies to the necessary refunds to Class Members for GCU Spring 2020 Housing/Room Fees, Parking Fees, Student Activity Fees, and Health Fees.

In contrast, GCU Spring 2020 instruction began on January 6, 2020 and ended on April 22, 2020.  (*See* Grand Canyon University Policy Handbook 2019-2020 (GCU000033-232) at p.21).  Accordingly, the proration that applies to the necessary refunds to Class Members for GCU Spring 2020 Lab Fees, Materials Fees, and Course Fees is 31/108 (28.70% rounded).

## Housing

Again, during the GCU Spring 2020 semester, GCU announced that it would provide a partial housing credit for those students who had moved off campus by the end of the day on March 25, 2020.  This limited "housing credit" did not make Class Members whole in regards to housing/room fees paid in relation to the Spring 2020 semester.

For the reasons set forth earlier in the "Proration" section, the file *GCU-L002900 – Pro Rata Refund COVID-19 Room  board fees 2019- 2020* shows that GCU incorrectly calculated the pro-rata percentage at 28.4% instead of 28.44% (31/109 rounded), then discounted it by 50%, then rounded down the result to the next lowest multiple of $10. GCU then issued credits — not refunds — of the resulting amounts to certain Class Members that had left their on-campus residence part-way through the Spring 2020 semester.  All told, this resulted in GCU providing only partial credits to certain Class Members (relative to Housing/Room Fees paid).  These credits were less than half of the correct pro-rata amount. It appears as if GCU reduced the proration to benefit itself to the detriment of the students.  There is no reason for GCU to have discounted its calculation by 50% and to then further round down to the nearest multiple of $10 other than to save money. From my review of the records, GCU never disclosed to the Class Members that this is what it was doing.

This table shows the distinctive data from the aforementioned file in the first four columns, followed by corrected calculations in the last three columns.

| Semester Rate | Pro-rata at 28.4% | Half of pro-rata | Amount | Pro-rata at 31/109 | Pro-rata at 34/113 | Shortfall (Amount minus 34/113 Pro-rata) |
|---|---|---|---|---|---|---|
| $1,875 | $533 | $267 | $260 | $533.26 | $564.16 | $304.16 |
| $2,300 | $654 | $327 | $320 | $654.13 | $692.04 | $372.04 |
| $2,500 | $711 | $356 | $350 | $711.01 | $752.21 | $402.21 |
| $2,900 | $825 | $412 | $410 | $824.77 | $872.57 | $462.57 |

---

[4] To ensure that the results are accurate, the exact ratio, 34/113, should be used when determining the proper amount of proration, and not the rounded percentage.  I used only exact ratios in the calculations discussed in this report.

| | | | | | | |
|---|---|---|---|---|---|---|
| $3,150 | $896 | $448 | $440 | $895.87 | $947.79 | $507.79 |
| $2,900 | $825 | $412 | $410 | $824.77 | $872.57 | $462.57 |
| $3,200 | $910 | $455 | $450 | $910.09 | $962.83 | $512.83 |

The semester rate column differs depending on the specific residence hall and occupancy, with higher amounts for a single occupancy than for double occupancy, and higher amounts for double occupancy than for triple occupancy. The semester rates were as follows:

- Single Occupancy (All Other Residences): $3,200
- Single Occupancy (North Rim Apartments): $3,150
- Studio Single (Papago Hall): $2,900
- Double Occupancy (North Rim Apartments): $2,900
- Double Occupancy (Canyon Hall and Cypress Hall): $2,300
- Double Occupancy (All Other Residences): $2,500
- Triple Occupancy: $1,875

GCU's accounting spreadsheet *GCU-L006598 09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* includes 45,355 rows with a BillCode of ROOM, covering 14,585 distinct Token ID values. Of these, 10,027 had a Category of Housing-Early Move-Out Credit. The BillCode ROOM refers to amounts billed in relation to the housing/room and board contract amounts paid by Class Members.  (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 186:19-25.)

Of the rows with this category, 9,981 had a Date of 3/30/2020, 44 had a Date of 4/20/2020, one had a Date of 5/1/2020 and one had a Date of 6/1/2020. These Dates do not correspond to the move-out dates, but rather appear to be the dates the pro-rata credits were made to the student account. 4,558 students represented by unique Token IDs did not receive any credit in this spreadsheet.

The sum of the values with a Category of Housing-Early Move-Out Credit was $3,873,950.00. Based on the correct 34/113 proration without a 50% discount and without rounding down to the nearest multiple of $10, the sum should have been **$8,310,457.59**, a difference of $4,436,507.59.

Note that GCU provided the approximately $3.9 million for moving out early as a credit to students' accounts, and not as cash refunds. Class Members are not able to choose how to spend the credits (*e.g.*, on renting an apartment or other necessities or paying down student loan debt), but rather are forced to spend credit money with GCU. The credit balance may also reduce the student's eligibility for need-based financial aid, as discussed in the "Credits vs. Cash Refunds" section. GCU should have instead provided Class Members with cash refunds. Therefore, GCU should refund the full $8,310,457.59 in prorated housing fees, rather than the difference between that number and the credits it already provided.

There is insufficient information in the GCU spreadsheet to determine why the remaining 4,558 students did not receive credits. None of the 4,558 students had departure plans that indicated an intent to remain on campus, according to the *GCU-L006605--3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)* spreadsheet. Of those 4,558 students, 2,687 had net housing charges of zero. In many cases, this appears to be due to a room switch adjustment. These students may have been

charged for housing costs for the full year up front, and only show up in this spreadsheet because of the room switch. If the 2,687 students with housing charges of zero were also due refunds, the refunds for these students would total approximately **$2.23 million to $2.28 million** based on the average full refund per student due to the other students.

For example, Token ID 924315977478618 had two transactions on 1/6/2020, one charge for $3,150.00 for North Rim Apts Bldg. 07 Single Occupancy NRA-B07-103-B-Bedroom-Small-A with a transaction date of 5/20/2019 and the other, a credit for ($3,150.00) for Room Switch Adjustment with a transaction date of 12/3/2019. This student was not listed as receiving a credit in this spreadsheet or in the *GCU-L006599 09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY).xlsx* spreadsheet. This is important because it demonstrates that there are thousands of students who did not receive a credit, perhaps because of errors in the method GCU used to identify students who are entitled to a housing refund. These students were included in the spreadsheet only because of the room change transactions.  However, if they paid for and continued to live in on-campus housing after a room change, they are of course owed refunds.

There may be other students who should have received refunds but who do not show up in the spreadsheet at all. For example, students may have paid for the full year of housing up front and not switched rooms, and thus, do not show up in the data for the Spring 2020 semester.

The remaining 1,871 students are potentially entitled to refunds totaling an additional **$1,590,773.07** (an average of $850.23 per student), if they moved out of the housing but weren't provided with a refund.

The total refund due to students is at least $8.3 million and may be as high as $12.2 million (or more). Because the partial credits were not cash refunds, GCU should issue refunds to the students for the full amount due to the students.

The spreadsheet *GCU-L006605--3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)* lists departure plans for 11,829 distinct Token IDs. It shows the amounts of the credits calculated by GCU for each student identified by Token ID. These figures understate the correct amount due from GCU for each student. The aggregated totals according to departure plan are as follows:

| Personal Departure Plan | Count | Credit Amount |
|---|---|---|
| **No Response** | 287 | No Credit |
| **N/A** | 7,184 | $2,743,960 |
| **Waiver to Remain** | 974 | No Credit |
| **Plan on leaving/moving out** | 3,138 | $1,247,370 |
| **Plan on staying** | 246 | No Credit |
| **TOTAL** | 11,829 | $3,991,330 |

The total credits of $3,991,330 shown as being due in this spreadsheet is $117,380 greater than the $3,873,950 total of the Housing-Early Move-Out Credit category in the *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet that

GCU actually provided. Similarly, the 11,829 student count is 1,802 greater than the 10,027 count from this spreadsheet. This yields a significant discrepancy between the two spreadsheets that suggests that many students did not receive the credits that GCU calculated for them and that GCU underpaid $117,380 *even by its own calculation*.

Digging deeper into the discrepancies between the two spreadsheets, there are 46 students represented by Token IDs who were not identified as receiving credits in the Departure Plans spreadsheet, but who received a total of $19,390 in credits in the Ledger Transactions spreadsheet, and 341 Token IDs who were identified as receiving a total of $136,770 in credits in the Departure Plans spreadsheet, but who did not receive credits in the Ledger Transactions spreadsheet. The difference between the two dollar amounts is $117,380, as noted in the previous paragraph. The remaining students did not have matching Token IDs in the two spreadsheets.

The file GCU-L002899--GCU Spring 2020 Housing Credit Policy states, "After all outstanding balances on your student account have been paid, the University will mail you a check in the following applicable amounts depending upon your housing option for the Spring 2020 semester, less any GCU-funded housing scholarships you may have received." GCU does not appear to have mailed checks to the students who did not graduate, but instead provided them with a credit to their student ledger.

It is noteworthy that the housing contract did not include any exceptions for acts of God, pandemics, government action, natural disasters, or other *force majeure* clauses.

Overall, the Class Members are owed housing/room fee refunds of $12.13 million to $12.18 million, which break down as follows:

- Housing/Room Fees for those students who already received a partial housing credit from GCU: $8,310,457.59 (10,027 students were listed as receiving partial housing credits; this calculation is definitive and precise for the listed students)
- Housing/Room Fees for those students who did not receive a partial housing credit from GCU: $2.23 million to $2.28 million (*estimate* for 2,687 students with a net housing charge of zero due to room switch adjustments who were not listed as receiving credits)
- Housing/Room Fees for those students who did not receive a partial housing credit from GCU: $1,590,773.07 (1,871 students with a non-zero net housing charge who weren't provided with a credit)

## Meal Plans

Class Members who lived on GCU's campus were required by GCU to purchase a meal plan, called Dining Dollars, which appear to involve a minimum purchase amount of $750, $1,000, or $1,350, depending on (1) whether the student was a new or returning student, and (2) the residence hall where the student lived. Commuter students were also able to purchase a meal plan but were not required to do so. The minimum amount of Dining Dollars allowed to be purchased by commuter students appears to have been $250.

Because Class Members living on campus were told to vacate their on-campus residence and return to their homes, and all Class Members had their classes moved to an online format, Class Members were unable to thereafter use their Dining Dollars, which only allowed a student to purchase meals or food at on-campus locations. Accordingly, the unused Dining Dollars that the student had remaining in their accounts at the time they were forced off campus by GCU should have been refunded to the students immediately, and not rolled over to a subsequent year as a credit. Rolling over the unused meal plan funds may reduce the student's eligibility for need-based financial aid, as discussed in the "Credits vs. Cash Refunds" section, and it also deprived students of the time-value of their funds. Rollover Dining Dollars are also subject to forfeiture if unused, and so do not represent a real refund.[5]

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 14,600 distinct Token IDs in 22,422 rows for the MEALPLAN BillCode. The Amounts contained in these rows sum to $15,015,262.86. This is the total amount Class Members paid for Dining Dollars for the Spring 2020 semester at GCU.  Of the 14,600 rows, 12,001 have a non-zero Amount. It does not provide any information about the Dining Dollars balances of the students.

There are 1,718 rows with a non-zero MLPNADJ (with a Description of Meal Plan Adjustment, and all but 6 with a Reference of DD Refund). These rows total ($313,036.51). Of these, 218 correspond to Token IDs with a MEALPLAN equal to zero, totaling ($5,317.35). Those rows may involve students who had a MEALPLAN balance from a previous academic year and no new purchase of MEALPLAN credits.

There are 1,500 rows with a Token ID corresponding to a non-zero MEALPLAN totaling $1,537,606.79 that also have a non-zero MLPNADJ totaling ($307,719.16). That's an average adjustment of ($205.15) on an average plan of $1,205.07, a ratio that corresponds to about a 20% refund.

The MLPNADJ was limited to the students who were graduating and was refunded in cash to the graduating students. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 226:18 to 227:21.)

The spreadsheet does not provide information about the remaining balance of the students who did not graduate. The remaining balance should be refunded to these students, as opposed to rolling them over to a subsequent year, because these students were unable to use their meal plans when they had all classes moved online and/or were told to leave the campus.

Excluding the students who received a MLPNADJ refund leaves a total MEALPLAN of $15,015,262.86 minus $1,537,606.79 (the total MEALPLAN for the graduating students) = $13,477,656.07 (the total MEALPLAN for the students who did not graduate). Assuming 34/113 proration of this total, based on the number of *days* off campus, would yield a refund owed of **$4,055,223.95**. Assuming proration of the *dollars*, similar to the students who did receive cash refunds, would yield a refund owed of **$2,697,319.35**.

---

[5] GCU'S University Policy Handbook Spring 2020, at 153 (GCU000033-000232) states: "Rollover Dining Dollars are not eligible for a refund and are forfeited at the time of graduation or when the student is no longer attending the university. Rollover dining dollars that were forfeited are not available to be reinstated at any time."

The figure based on 34/113 proration is more likely to be accurate because the average Dining Dollars purchased was $895.00 per graduating student compared with $1,046.24 for students who did not graduate.

## Parking

Class Members who purchased on-campus parking were charged and paid Parking Fees that varied in amounts, depending on the student's assigned parking lot or garage and the type of the student's vehicle. The fees also appear to vary depending on whether the student was paying for the full academic year or only the spring semester.

The spreadsheet *GCU-L006607--iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)* lists a total of $1,729,855 in parking fees for 12,182 students.

There are no corresponding transactions listed in the *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* and *GCU-L006599--09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY)* spreadsheets.

The student parking fees show the following patterns.

1.  The fees for Campus Resident - - Lot A and Campus Resident - - Lot C (a total of 204 permits) are $50.00, regardless of the date ordered, whether in early fall 2019 or early Spring 2020. These appear to be flat fees regardless of when they were purchased.

2.  The fees for Campus Resident (29th Ave Garage, Missouri Garage, Halo Garage, Grove Garage, Oversized Vehicle) and Commuter Student (31st Ave Garage, Oversized Vehicle) are $150 in fall 2019 (10,999 from May 1, 2019 to December 5, 2019) and $75 in spring 2020 (800 from December 9, 2019 to March 27, 2020). The $150 fees were likely for the full academic year and the $75 fees for just the spring semester.

3.  In addition, a motorcycle permit cost $100 in fall 2019 (28 from May 2, 2019 to October 20, 2019), $75 in late fall 2019 (2 in October and November 2019) and $50 in Spring 2020 (4 from January 7, 2020 to February 16, 2020).

4.  There were a few rows of data that don't match these patterns, such as 31 with fees of $100 for Missouri Garage, 29th Ave Garage, Halo Garage and Grove Garage in fall 2019 (from May 8, 2019 to August 26, 2019), one with fees of $130 for 31st Street Garage on July 30, 2019. These may have been prorated or may have been motorcycle permits that were not labeled as such.

5.  There was also one row of data with fees of $15 at 29th Ave Garage on March 12, 2020 and one with fees of $20 at 29th Ave Garage on March 20, 2020, 107 with fees of $30 for 31st Ave Garage, 29th Ave Garage, Halo Garage, Grove Garage and Missouri Garage from August 12, 2019 to April 2, 2020, two with fees of $40 at Halo Garage and 31st Ave Garage on August 9, 2019, and two with fees of $50 at Missouri Garage on July 16, 2019 and October 14, 2019. These may have been short-term parking permits.

Based on the 34/113 proration, the $150 full-year and $75 spring semester fees would require a refund of $22.57 each and the motorcycle permits would require a refund of $15.04 each.

Refunds totaling $267,537.03 are due to 11,865 students [(10,999 + 800) x $22.57 + (28 + 2 + 4) x $15.04 + (31 + 1) x $22.57]. That's 15.47% of the total parking fees in the spreadsheet, affecting 97.4% of the students listed in the spreadsheet.

This total does not include the first and fifth patterns listed above, which represent $13,625 in fees to 317 students. Those represent 0.79% of the total parking fees and 2.6% of the total number of students.

I compared the Token IDs in the *GCU-L006607--iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)* and the *GCU-L006605--3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)* spreadsheets and a total of 888 of the 8,130 students with a Permit Type of Campus Resident were not eligible for a parking refund because they remained in on-campus housing. Of these, 782 had charges of $150, 71 had charges of $75, 2 had charges of $100, 25 had charges of $50 (Lot A or Lot B), 1 had a charge of $50 (motorcycle permit), 6 had charges of $30 and 1 had a charge of $20. Since these students remained in their on-campus housing through the entire Spring 2020 semester, I assume that they are not entitled to refunds of their Parking Fees.  The total refunds that would have been due to these students *had they left campus* is $19,297.33 [(782 + 71) x $22.57 + 3 x $15.04]. By excluding students that remained on campus, the total refunds owed to Class Members for parking fees paid is reduced from $267,537.03 to **$248,239.70.**

## Activity Fee

GCU's Spring 2020 student Activity Fee provided on-campus students access to on campus amenities, such as swimming pools, a bowling alley, game room, recreation centers (including fitness equipment), and an activity center, all of which were not available to students who were required to vacate the campus.[6] The student activity fee also provided free admission to athletic events and theater, music and dance productions, which GCU also cancelled during the Spring 2020 semester. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 150-157; 30(b)(6) Deposition of GCU, Designee Tim Griffin, at 35-37.)

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 24,863 rows with a BillCode of ACTVFEE and a Description of Activity Fee. The BillCode ACTVFEE refers to amounts billed in relation to the Activity Fee paid by Class Members.  (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 174:20-22). These rows correspond to 19,876 distinct Token IDs. The sum of all rows is $4,905,600.00.

When the rows for each Token ID are summed, 7,342 Token IDs have a sum of zero and 17,521 have a sum of 300.00. The Token IDs with a sum of zero have the offsetting transaction with a PostDate that is

---

[6] *See* 30(b)(6) Deposition of GCU, Designee Junette West, at 45:8-47:16.

several months after the PostDate for the initial payment. For example, Token ID "919426947504408"has "300.00" with a PostDate of "7/31/2019" and "(300.00)" with a PostDate of "11/14/2019." None of the rows have a Reference that indicates a refund due to withdrawal. PostDate ranges from 2/17/2019 to 1/24/2020. All have a TermCode of 2020SPRING.

Assuming that the $300.00 activity fee is just for the Spring 2020 semester,[7] 34/113 proration would yield a refund of $90.27 per student. I assume that the Token IDs with a sum of zero were not refunded, but totaled the refunds for them separately for clarity. The total refunds should be $1,581,620.67 for the Token IDs with a sum of 300.00 and $662,762.34 for the Token IDs with a sum of zero, yielding an overall total refund due of **$2,244,383.01** in relation to the Student Activity Fee amounts paid by Class Members.

## Health Fee

The Health Fee provided Class Members with access to a health clinic on campus, which would not be available to students who were required by GCU to vacate the campus or who had no reason to come to campus because all classes moved online.[8]

The Health Fee does not provide health insurance, for which there is a separate, much higher fee.  I understand that Plaintiff does not seek a refund of health insurance costs on behalf of himself or the Class Members.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 24,863 rows with a BillCode of HLTHFEE, a Description of Health Fee in the Campus Fee category and a TermCode of 2020SPRING. The BillCode HLTHFEE refers to amounts billed in relation to the Health Fee paid by Class Members.  (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 175:1-5). These rows correspond to 19,876 distinct Token IDs. The sum of all the rows is $1,308,160.00.

When the rows for each Token ID are summed, 3,524 Token IDs have a sum of zero and 16,352 have a sum of 80.00. The Token IDs with a sum of zero have the offsetting transaction with a PostDate that is several months after the PostDate for the initial payment. For example, Token ID "919426947504408" has "80.00" with a PostDate of "7/31/2019" and "(80.00)" with a PostDate of "11/14/2019". PostDate ranges from 2/17/2019 to 1/24/2020. All have a TermCode of 2020SPRING.

Assuming that the $80.00 health fee is just for the Spring 2020 semester, 34/113 proration would yield a refund due of $24.07 per student. I assume that the Token IDs with a sum of zero were not refunded, but totaled the refunds for them separately for clarity. The total refunds are $393,592.64 for the Token IDs

---

[7] Page 152 University Policy Handbook Spring 2020 (GCUL000033-000232) lists the Student Activity Fee as $300 per semester.

[8] *See* 30(b)(6) Deposition of GCU, Designee Junette West, 55:13-18, Ex. 5.

with a sum of 80.00 and $84,822.68 for the Token IDs with a sum of zero, yielding an overall total refund due of **$478,415.32** in relation to Health Fee amounts paid by Class Members.

## Lab Fees

Lab Fees for the Spring 2020 semester were charged by GCU and paid by Class Members enrolled in certain classes. GCU used the Bill_Code of "LABFEE" to identify payments or charges of Lab Fees. Note that LABFEE is distinct from the Bill Code "TUIT", which is the tuition charges for each class. LABFEE would be a supplemental fee related to access to, and use of, a physical lab or studio on GCU's campus, and all of the tools and resources that come with an on-campus lab.

As discussed above, GCU's Spring 2020 University Policy Handbook states that instruction began on January 6, 2020 and ended on April 22, 2020. Accordingly, the proration relevant to Lab Fees, Materials Fees and Course Fees is 31/108.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 24,859 rows with a BillCode of LABFEE with a TermCode of 2020SPRING. These rows correspond to 7,525 distinct Token IDs. The sum of all the rows is $770,700.00. 20,954 (84%) of the rows have a description that includes the word "Lab" in addition to the name of the course (e.g., "General Chemistry I – Lab").

When the rows for each Token ID are summed, 2,591 Token IDs have a sum of zero (corresponding to 4,764 total positive LABFEEs), 2,603 have a sum of 100.00, 1,942 have a sum of 200.00, 336 have a sum of 300.00 and 53 have a sum of 400.00.

Of the rows with negative Amounts, 7,476 have a Reference of UNREG/DROP REFUND, indicating that the student received a refund because they dropped the class. 1,098 have a Reference of Auto-Adjust.

Of the Token IDs with a sum of zero, 1,997 have a Reference of UNREG/DROP REFUND and 594 have a Reference of Auto-Adjust. The latter correspond to a total of 881 negative amounts of (100.00).

The differences in the sums corresponds to the number of courses that have a LABFEE that were taken by the student. The LABFEE appears to be $100.00 per student per course with a lab fee. In other words, students with a LABFEE sum of 500.00 took five classes with an associated lab fee.

31/108 proration of an individual $100.00 LABFEE would yield a refund of $28.70 per LABFEE per student. I assume that the Token IDs with a sum of zero where the student did not drop the class were not refunded, but totaled the refunds for them separately for clarity.

The total refunds are $74,706.10 for the 2,603 Token IDs with a sum of 100.00, $111,470.80 for the 1,942 Token IDs with a sum of 200.00, $28,929.60 for the 336 Token IDs with a sum of 300.00, $6,084.40 for the 53 Token IDs with a sum of 400.00 and $25,284.70 for the 881 Token IDs with a sum of zero (excluding the ones where the student got a refund from dropping the class). This yields an overall total refund due of **$246,475.60** in relation to Lab Fee amounts paid by Class Members.

## Materials Fees

Materials Fees were assessed against certain Class Members as supplemental fees for supplies and materials to be used in in-person classes. Note that MTRLS is distinct from "TUIT", which is the tuition charge for each class.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 161,958 rows with a BillCode of "MTRLS" (representing Materials Fee amounts billed) with a TermCode of 2020SPRING. These rows correspond to 20,083 distinct Token IDs.

The sum of all the rows is $6,094,935.00. Of the rows with negative values, 47,164 have a Reference of UNREG/DROP REFUND, indicating that the student received a refund because they dropped the class. One has a reference of CST-211. 4,796 have a Reference of Auto-Adjust.

When the rows for each Token ID are summed, 3,714 Token IDs have a sum of zero (corresponding to 16,162 total positive MTRLS), 575 have a sum of 105.00, 1,450 have a sum of 210.00, 4,417 have a sum of 315.00, 8,501 have a sum of 420.00, 1,243 have a sum of 525.00, 179 have a sum of 630.00 and 4 have a sum of 735.00. The sums are all multiples of 105.00.

Of the Token IDs with a sum of zero, 2,819 have a Reference of UNREG/DROP REFUND and 895 have a Reference of Auto-Adjust. The latter correspond to a total of 3,080 negative amounts of (105.00). The differences in the sums correspond to the number of courses that have a MTRLS that were taken by the student. The MTRLS appears to be $105.00 per course with a materials fee.

31/108 proration of the MTRLS would yield a refund of $30.14 per Materials Fee charged per student. I assume that the Token IDs with a sum of zero where the student did not drop the class were not refunded, but totaled the refunds for them separately for clarity.

The total Materials Fee refunds due to Class Members, once the Materials Fee amounts are prorated according to the above ration, are $17,330.50 for the 575 Token IDs with a sum of 105.00, $87,406.00 for the 1,450 Token IDs with a sum of 210.00, $399,385.14 for the 4,417 Token IDs with a sum of 315.00, $1,024,880.56 for the 8,501 Token IDs with a sum of 420.00, $187,320.10 for the 1,243 Token IDs with a sum of 525.00, $32,370.36 for the 179 Token IDs with a sum of 630.00, $843.92 for the 4 Token IDs with a sum of 735.00 and $92,831.20 for the 895 Token IDs with a sum of zero (excluding the ones where the student received a refund because they dropped the class). This yields an overall total refund due of **$1,842,367.78** in relation to Material Fee amounts paid by Class Members.

## Course Fees

Class Members were required to pay Course Fees in certain instances. The Course Fees were supplemental fees for clinical, lab, studio and personalized in-person training. Examples include Ballet, Choreography, Dance, Hospitality, Jazz, Nursing Clinical, Practicum, Private Applied Instruction, Private Guitar Study, Private Keyboard Study, Private Percussion Study, Private Piano Study, Private Voice Study, and

- 15 -

Vernacular Dance. Private one-on-one and small group in-person training like this cannot be moved online in an effective manner, so students should be refunded the Course Fee amounts on a pro-rata basis.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 4,846 rows with a BillCode of "CRSEFEE" (representing Course Fee amounts billed) with a TermCode of 2020SPRING. These rows correspond to 1,877 distinct Token IDs.

Note that CRSEFEE is distinct from TUIT, which is the tuition charges for each class.

This table shows the number of rows for each CRSEFEE Amount.

| Amount | Count |
|---|---|
| 50.00 | 521 |
| 60.00 | 673 |
| 70.00 | 1688 |
| 75.00 | 18 |
| 80.00 | 2 |
| 100.00 | 440 |
| 300.00 | 402 |
| 425.00 | 125 |
| (50.00) | 174 |
| (60.00) | 246 |
| (70.00) | 171 |
| (75.00) | 8 |
| (80.00) | 2 |
| (100.00) | 155 |
| (300.00) | 160 |
| (425.00) | 61 |

The sum of all the rows is $278,210.00.

Of the rows with negative values, 929 have a Reference of UNREG/DROP REFUND, indicating that students received refunds because they dropped the class. 48 have a Reference of Auto-Adjust.

When the rows for each Token ID are summed, 374 Token IDs have a sum of zero (corresponding to 555 total positive CRSEFEE). This table shows the counts for each sum.

| Sum | Count |
|---|---|
| 0 | 374 |
| 50 | 31 |
| 60 | 407 |
| 70 | 124 |
| 100 | 223 |

| | |
|---|---|
| **120** | 9 |
| **140** | 4 |
| **150** | 13 |
| **200** | 43 |
| **210** | 91 |
| **250** | 23 |
| **280** | 278 |
| **300** | 160 |
| **350** | 4 |
| **360** | 2 |
| **400** | 4 |
| **425** | 29 |
| **500** | 4 |
| **525** | 1 |
| **550** | 3 |
| **600** | 21 |
| **700** | 1 |
| **725** | 13 |
| **775** | 1 |
| **800** | 2 |
| **850** | 1 |
| **900** | 2 |
| **1025** | 1 |
| **1050** | 1 |
| **1075** | 1 |
| **1100** | 2 |
| **1150** | 2 |
| **1225** | 1 |
| **1525** | 1 |

Of the Token IDs with a sum of zero, 341 have a Reference of UNREG/DROP REFUND and 33 have a Reference of Auto-Adjust. The latter correspond to a total of 46 negative amounts of (50.00) to (600.00).

The differences in the sums corresponds to the number of courses that have a CRSEFEE that were taken by the student and the varying CRSEFEE. The CRSEFEE appears to be $50.00 to $425.00 per course with a course fee.

31/108 proration of the CRSEFEE would yield a total refund due of $79,856.57, not counting the Token IDs with a zero sum. The zero sum Token IDs that have a Reference of Auto-Adjust are due a total refund of $1,132.36. This yields an overall total refund due of **$80,988.93** in relation to Course Fee amounts paid

- 17 -

by Class Members. (I assume that the Token IDs with a sum of zero where the student did not drop the class were not refunded, but totaled the refunds for them separately for clarity.)

## Credits vs. Cash Refunds

GCU provided partial credits of some housing fees and meal plan fees paid by some Class Members. Providing an owed refund in the form of a credit, as opposed to cash, does not make Class Members whole because providing credits to students will affect their subsequent eligibility for need-based student financial aid and deprives them of the choice of how to use their funds, as well as the time-value of their money.

In the Higher Education Act of 1965, education-related expenses are used as a cap on the amount of student financial aid students may receive, with the amount of financial aid being directly correlated with a student's "financial need" – the more "financial need" of a student, the more financial aid that student will qualify to receive. Section 471 of the Higher Education Act defines "financial need" as the difference between education-related expenses (the cost of attendance) and the sum of the expected family contribution and estimated financial assistance. Estimated financial assistance is defined by Sections 480(j) and 428(a)(2)(C) of the Higher Education Act[9] as the resources a college is aware of or can anticipate at the time the student aid award is made.

"Financial need" is defined[10] as COA minus EFC minus EFA, where

- "COA" is the cost of attendance, including tuition, fees, books, supplies, equipment, room and board, transportation and miscellaneous personal expenses, along with other costs such as special needs expenses, study abroad, dependent care costs, and the cost of a computer.
- "EFC" is the expected family contribution, a measure of the family's financial strength.
- "EFA" is estimated financial assistance, which includes all scholarships, grants, loans, or other assistance known to the institution at the time the determination of the student's need is made, including national service education awards, but excluding veterans' education benefits, combat pay, education tax benefits, tax-free distributions from 529 plans, prepaid tuition plans and Coverdell education savings accounts.

During the pandemic, the U.S. Department of Education stated that a cash refund is not considered EFA, while a credit (coupon refund) is considered EFA.[11] Thus, a cash refund does not affect eligibility for

---

[9] 20 U.S.C. § 1087vv(j) and § 1078(a)(2)(C), respectively.

[10] For federal student aid purposes, financial need is defined at 20 U.S.C. § 1087kk.

[11] *Is It EFA If a School Delays a Refund Of Institutional Charges Until the Following Academic Year Due To Coronavirus?*, AskRegs, KA-34731, National Association of Student Financial Aid Administrators (NASFAA). https://askregs.nasfaa.org/article/34731/is-it-efa-if-a-school-delays-a-refund-of-institutional-charges-until-the-following-academic-year-due-to-coronavirus

subsequent need-based financial aid, while a credit reduces the amount of need-based aid that the student would otherwise be eligible to receive in a subsequent year.

In addition, GCU appears to have violated the cash management regulations at 34 C.F.R. § 668.164(h)(2), which require payment of a credit balance on the student's account within 14 days unless the student or parent authorizes the college to hold onto the funds (in which case the college must hold cash in the amount of the credit balance in a depository account).

Further, providing funds as credits instead of refunds prevents the students from choosing how to spend their money. The decision whether to spend the funds within the GCU ecosystem or on other expenses (e.g., off-campus rent, computers, paying down debt, other necessities) should have been left to the students. By providing credits rather than refunds, GCU forced students to spend the money within GCU or lose the value of those funds.  In other words, GCU did not refund the money at all, it kept the money it to offset future spending at GCU.

Providing credits for the amounts due to students also ignores the time value of money. Some students may have been forced to charge these expenses mentioned above to credit cards, with interest charged on the credit card balance, or experienced the opportunity cost of spending down interest-bearing savings account balances. Or, maybe a student would have decided not to purchase a meal plan for the next year but for the credit provided which forced the decision. These are just some examples. The point is that the students should have received their funds back as cash refunds to use as they saw fit. The same analysis applies in relation to expenses paid with student loans.

Finally, credit balances may be subject to forfeiture if unused. For example, if the student graduates or withdraws from the university, they cannot receive a refund of their Dining Dollars.

GCU should have issued cash refunds to their students for the Spring 2020 semester, instead of issuing, in some cases, limited credits.

## Qualifications

My opinions are based on my personal experience and expertise as a thought leader in all aspects of planning and paying for college, including student financial aid, student loans, education tax benefits, and saving for college. I have served as publisher of several websites that have helped more than 100 million families plan, save, and pay for college. I have written numerous articles that were published on these websites and in traditional news media. I have personally responded to thousands of questions from consumers, financial professionals, educators and policymakers. I have given talks, both online and in person, on these topics, including Q&A sessions open to the public.

I am President of Cerebly, Inc. (formerly MK Consulting, Inc.), a consulting firm focused on computer science, artificial intelligence and statistical and policy analysis. Cerebly's clients have included the Advisory Committee on Student Financial Assistance (ACSFA), a committee established by Congress to advise it on student financial aid policy. Cerebly also publishes the web site PrivateStudentLoans.guru, among several other web sites.

I previously served as Publisher and Vice President of Research of Saving for College LLC from 2018 through 2020. Saving for College LLC publishes Savingforcollege.com, the most popular guide to planning, saving, and paying for college.  I wrote many articles for Savingforcollege.com and was responsible for the website's 5-cap ratings and performance rankings of 529 college savings plans, 529 plan fee study, college savings plan comparison tools, college savings calculators, and college savings resources for financial professionals. I also edited and updated the *Family Guide to College Savings* and the *Complete Guide to College Savings* books published by Savingforcollege.com.

Before serving as Publisher and VP of Research for Savingforcollege.com, I was Publisher and Vice President of Strategy for Cappex.com LLC from 2016 to 2017. Cappex.com is a free consumer-facing web site about college admissions and financial aid.

Before serving as Publisher and VP of Strategy for Cappex.com, I was Senior Vice President and Publisher of Edvisors Network, Inc. from 2013 to 2015. Edvisors Network, Inc. publishes several consumer-facing web sites, including Edvisors.com, ScholarshipPoints.com and PrivateStudentLoans.com.

Before serving as Senior Vice President and Publisher of Edvisors Network, Inc., I was VP of Advanced Projects for Monster Worldwide and Publisher of FinAid, Fastweb and other consumer-facing web sites owned by Monster Worldwide, from 2001 to 2013. I founded FinAid in 1994. FinAid and Fastweb merged in 1999 and were acquired by Monster Worldwide in 2001.  I designed and implemented all of the calculators on the FinAid web site, including several college savings calculators. I also wrote more than 100,000 lines of SQL code, a computer programming language for accessing and modifying databases, for analyzing Fastweb traffic and revenue data for the purpose of optimizing advertising revenue.

I have also previously worked as a Research Scientist for Just Research, a Software Engineer for the MIT Artificial Intelligence (AI) Laboratory, a Software and Digital Typography Consultant in the Advanced Development Group at Bitstream Inc., and an Assistant Programmer Analyst for the Planning Research Corporation.

I served on the editorial board of the Journal of Student Financial Aid from 2011 to the present. I also served on the editorial board of the Council on Law in Higher Education from 2004 to 2011. I was a member of the board of directors of the National Scholarship Providers Association from 2009 to 2015 and am still a member of their research and advocacy committees.

I have been quoted in numerous newspaper and magazine articles and have written for the New *York Times, Wall Street Journal, Washington Post, Reuters, Huffington Post, U.S. News & World Report, Money Magazine, Bottom Line/Personal, Forbes, Newsweek* and *Time Magazine*. I was named a Money Hero by *Money Magazine* in 2012. I served as the curator for the Student Loans Topics Page for the New York Times from 2009 to 2010. I served as the Student Loan Guru for FiLife.com, a Dow Jones/IAC property, from 2008 to 2010. I have served on the editorial advisory board of various Boardroom Inc. publications, such as Bottom Line/Personal and Bottom Line/Wealth, from 2008 to the present.

I am the author of five bestselling books about student financial aid, including *How to Appeal for More College Financial Aid, Twisdoms about Paying for College*, *Filing the FAFSA* and *Secrets to Winning a*

- 20 -

*Scholarship*. Two of these books won Excellence in Financial Literacy Education (EIFLE) Awards from the Institute for Financial Literacy. My most recent book is *Who Graduates from College? Who Doesn't?*

I have testified before Congress, federal/state agencies and national professional organizations on several occasions, including:

- *Trends in Student Loan Debt*, Keynote Address, NAGTRI/SABA Bankruptcy Seminar, National Association of Attorneys General (NAAG), November 14, 2017.
- *Pay Me Now or Pay Me Later*, College Savings Plan Network Conference, National Association of State Treasurers (NAST), May 13, 2015.
- *The Challenge of Rising Student Loan Debt*, California Student Aid Commission, Symposium on Student Debt, November 14, 2014.
- U.S. Senate Committee on Banking, Housing and Urban Affairs, hearing entitled *Turmoil in U.S. Credit Markets: Impact on the Cost and Availability of Student Loans*, April 15, 2008. My testimony and white paper lead to passage of the Ensuring Continued Access to Student Loans Act of 2008 (P.L. 110-227 and 110-359).

I have written more than 150 student aid policy analysis papers (available at www.studentaidpolicy.com).

I have won numerous awards, including College Financing Ace from *Investment Advisor Magazine*, Excellence in Financial Literacy Education (EIFLE) from the Institute for Financial Literacy, Money Hero from *Money Magazine*, Creative Leadership Award from the California Association of Student Financial Aid Administrators (CASFAA), Special Award from the College Board, the Jefferson Medal from the American Institute for Public Service and a Meritorious Achievement Award from the National Association of Student Financial Aid Administrators (NASFAA). I was named as a Fellow of the National Scholarship Providers Association (NSPA) in 2021. I received the Senator Joseph I. Lieberman Award for Outstanding Achievement in STEM in 2021.

Profiles of me written by journalists include:

- Bernice Napach, Mark Kantrowitz: College Financing Ace — The 2016 IA 25, Investment Advisor Magazine, May 24, 2016.
- Steve Rosen, Expert discusses the rising cost of college and student loan debt, Kansas City Star, May 29, 2015.
- Beckie Supiano, Everybody's Go-To Methodical Mind, Chronicle of Higher Education, July 15, 2013.
- Jane J. Kim, Student-Loan Gadfly Gets a Starring Role as the U.S. Pushes Out the Private Lenders, Wall Street Journal, July 3, 2010.

I earned two Bachelor of Science degrees from the Massachusetts Institute of Technology in 1989, one in mathematics and one in philosophy, and a Master of Science degree in computer science from Carnegie Mellon University in 1991. I am an alumnus of the Rickover Science Institute (RSI) in 1984.

## Prior Testimony

In the last four years, I have testified at trial and/or deposition in the following cases:

- *Dawson vs. Great Lakes Educational Loan Services, Inc. et al.*, Case No. 15-cv-475-JDP, United States District Court for the Western District of Wisconsin.
- *Eric Eberts v. Deborah R. Eberts*, Case No. 07-FA-450, State of Wisconsin Circuit Court, Winnebago County Branch IV.
- *Evan Brian Crocker et al. vs. Navient Solutions, LLC et al.*, Case No. 15-35886, United States Bankruptcy Court for the Southern District of Texas, Houston Division.
- *Homaidan v. Sallie Mae, Inc. et al.*, Case No. 1-17-01085-ESS, United States Bankruptcy Court for the Eastern District of New York.
- Loguidice v. Gerber Life Insurance Company, Case No. 7:20-cv-03254-KMK, United States District Court for the Southern District of New York.
- *Tashanna B. Golden fka Tashanna B. Pearson v. National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-4, GS2 2016-A, Pennsylvania Higher Education Assistance Agency d/b/a American Education Services, Firstmark Services*, Case No. 16-40809 (ESS), Chapter 7, Adv. Pro. No. 17-1005 (ESS), United States Bankruptcy Court for the Eastern District of New York.
- *Troy Orlando Robinson and Anthony W. Spears v. Wells Fargo Bank, N.A., Citibank, N.A., The Student Loan Corporation, Discover Financial Services, Inc., Discover Products, Inc. et. al.*, Case No. 11-80896, United States Bankruptcy Court for the District of Nebraska.

## Documents Reviewed

- Ledger Card for Carson J. Little (GCU-L000030-32)
- GCU-L002899—GCU Spring 2020 Housing Credit Policy
- GCU-L002900—Pro Rata Refund COVID-19 Room  board fees 2019- 2020
- GCU-L006598—09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))
- GCU-L006599—09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY)
- GCU-L006602—FINAL CARES Reconciliation FY 2021 (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY)
- GCU-L006605—3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)
- GCU-L006607—iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)
- Little Housing Contract Email  (PL000346-000348)
- University Calendar for Spring 2020
- 2019-2020 University Policy Handbook Spring (GCU-L000033-000232)
- Class Action Complaint
- Grand Canyon University's Answer to Complaint

- Carson Little Enrollment and Finance Agreement (GCU-L002277-002291)
- Housing Policies (PL001596-001603)
- 30(b)(6) Deposition of GCU, Designee Junette West Deposition Transcript and Exhibits 1 through 19
- Junette West Individual Deposition Transcript
- 30(b)(6) Deposition of GCU, Designee Tim Griffin, Deposition Transcript, and Exhibits 1 through 13

_____     1/19/2023
Signature                             Date

EXHIBIT 2

**In the Matter Of:**

LITTLE V GCU

2:20-cv-00795-PHX-SMB

---

**MARK KANTROWITZ**

*March 17, 2023*

---

800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1

2                    UNITED STATES DISTRICT COURT

3                        DISTRICT OF ARIZONA

4

5

6    Carson Little,              )
                                 )
7         Plaintiff,             )
                                 )
8    vs.                         )No.  2:20-cv-00795-PHX-SMB
                                 )
9    Grand Canyon University,)
                                 )
10        Defendant.             )

11

12

13

14

15

16              DEPOSITION OF MARK KANTROWITZ

17                 (Via videoconference)

18            Taken on behalf of the Defendant

19                    March 17, 2023

20

21

22

23

24

25



1     Q    So, Mr. Kantrowitz, on page 21 of your report

2   it refers to testimony you've given at trial or

3   deposition in the last four years.  But I wanted to get

4   a little more detail there.  Which of those are trial

5   testimony?

6     A    So you mean 21 of the document, not 21 of the

7   PDF.  So I've got to get to there.  Okay.  It's

8   actually page 22.

9     Q    Yeah.  It's actually page 22.  I said 21.

10  It's actually, now that I'm looking at it, it's on page

11  22 of your report, not 21.

12    A    Okay.  So Eberts v. Eberts was actual in-court

13  testimony.  And the others were -- it looks like all of

14  them were depositions.  Didn't write that down.  And

15  then in all of them I've done expert reports.  Nothing

16  in trial other than Eberts v. Eberts.

17    Q    Okay.  What was Eberts versus Eberts about?

18  What kind of case?

19    A    It was a divorce case that impinged on 529

20  college savings plans.  The definition of a qualified

21  expense.

22    Q    And what was your role in that case?

23    A    I was an expert witness for Mr. -- well,

24  Dr. Eberts.

25    Q    Testifying about, what?  What is a qualified



1   expense under 529?

2        A    Yes.

3        Q    Okay.  Did you testify about anything else?

4        A    No.

5        Q    Okay.  So the others then, I take it, were all

6   deposition testimony.

7        A    Yes.

8        Q    Can you tell me about Dawson versus Great

9   Lakes?  What was that about?

10       A    That was about capping versus non-capping

11  forbearances.

12       Q    Forbearances for, what?

13       A    For federal student loans.

14       Q    And what was the scope of your testimony?

15       A    There were certain forbearances that were --

16  where the interest was capitalized and certain ones

17  where the interest was not capitalized.  The defendant

18  did not properly capitalize interest.  And my role was

19  to calculate the damages relating from that.

20       Q    So calculating damages from the failure to do,

21  what?

22       A    From the failure to properly capitalize

23  interest on federal student loans.  It incorrectly

24  capitalized interest.

25       Q    And how did you find a method to do that?



```
1    I'd have to look that up.

2         Q    Where are they located?

3         A    Wisconsin.

4         Q    Do you know what city in Wisconsin?

5         A    No.  I would have to look that up.

6         Q    Who were the attorneys who you worked with in

7    connection with the Eberts versus Eberts case?

8         A    That was a Chicago law firm.  And I don't

9    recall the name of the attorney.

10        Q    And you don't recall the name of the firm?

11        A    No.

12        Q    In that Crocker versus Navient case, did you

13   testify about anything other than which loans should

14   have been discharged and which ones should not have

15   been discharged?

16        A    No.

17        Q    Tell me about the -- is it Homaidan versus

18   Sally Mae?

19        A    The Homaidan versus Sally Mae is similar to

20   the Navient case.

21        Q    What did you testify about in that case?

22        A    Same thing.  What loans are and aren't

23   dischargeable.

24        Q    Anything else?

25        A    No.  That's it.
```



1    Q    Do you have a report in connection with the

2  work that you did in that case?

3    A    Yes.

4    Q    Who were the attorneys who you worked with in

5  that case?

6    A    George Carpinello.

7    Q    Again, with the Boies Law Firm?

8    A    Yeah, with the Boies Law Firm.

9    Q    Okay.  When did you give the deposition in

10 that Homaidan --

11   A    Homaidan.

12   Q    Yeah.  Homaidan.  When did you give that

13 deposition?

14   A    That would have been in either 2020, 2021, or

15 2022.

16   Q    And the Crocker case versus Navient, when was

17 that?

18   A    Same thing.

19   Q    Could you tell me about the Loguidice versus

20 Gerber Life Insurance Company case please?

21   A    That involves life insurance policies --

22 whole-value life insurance policies that Gerber Life

23 was promoting as a way of saving for college.

24   Q    What was the nature of your testimony?

25   A    My testimony is that those were worthless.



1   plaintiff.  Yes.  So in all these I believe I was with

2   the plaintiffs.

3        Q    In your list you've got another case, Tashanna

4   B. Golden versus National Collegiate Student Loan

5   Trust, 2005.  What is that case about?

6        A    It's also a bankruptcy case, like the others.

7        Q    Are the ones above all bankruptcy cases?  I

8   know you mentioned one of them was bankruptcy.

9        A    Not Loguidice.  Not Eberts.  Not Dawson.  But

10  Crocker, Homaidan and Golden were all bankruptcy cases.

11       Q    What was the nature of your testimony in this

12  case, the --

13       A    Same thing.  What is and isn't a qualified

14  education loan.  And, therefore, dischargeable or not.

15       Q    Anything else or was that the entire scope of

16  the testimony?

17       A    That was the entire scope of the testimony.

18       Q    Do you have a report that you generated in

19  connection with that case against the National

20  Collegiate Student Loan Trust?

21       A    Yes.

22       Q    Who were the attorneys that you worked with on

23  that matter?

24       A    George Carpinello.

25       Q    Is that case still going on?



1          So the Troy Orlando Robinson and Anthony W.

2    Spears versus Wells Fargo Bank case, tell me about

3    that.  What was that about?

4        A    That's also a bankruptcy case about what loans

5    are and aren't dischargeable.

6        Q    Is that the entire scope of your testimony?

7        A    Yes.

8        Q    And, again, you prepared a report and you have

9    it somewhere in your files?

10       A    Yes.

11       Q    And which attorneys did you work with in that

12   matter?

13       A    Again, George Carpinello.

14       Q    Do you know if that case is still ongoing?

15       A    I don't think so, but I don't specifically

16   follow up after my expert report and any depositions

17   until I'm contacted about potential testimony in a

18   case.

19           MR. MILLER:  Just so we can make sure you keep

20       on efficient -- you just have to answer his

21       questions.  He's just asking you, you know, if you

22       know or something.  It's just yes or no.

23           THE WITNESS:  Okay.

24   QUESTIONS BY MR. KARDASSAKIS:

25       Q    I know your report says those are the cases



1   you testified for and have testified in in the last

2   four years.  Have you testified in other cases perhaps

3   more than four years ago?

4        A    A long time ago I testified in a patent

5   dispute case involving a programming language, Common

6   Lisp.  Involved music.  I provided a declaration for

7   the Federal Trade Commission in one of their lawsuits

8   against an alleged scholarship scam.

9        Q    Any others?

10       A    Don't recall.

11       Q    What was the name of the patent case?

12       A    I don't recall that.  That was more than 20

13  years ago.

14       Q    And what was the nature of your testimony in

15  the patent case?

16       A    I'm an expert on the programming language

17  Common Lisp.

18       Q    How do you spell that please?

19       A    C-o-m-m-o-n L-i-s-p.

20       Q    And what makes you an expert on the

21  programming language Common Lisp?

22       A    When I was in graduate school, I developed

23  several software utility programs for the programming

24  language Common Lisp that have been used by most

25  programmers in that programming language.  I



1    A    My testimony wasn't specific -- I wasn't
2  specifically asked about breach of contract.  But there
3  may have been breach of contract issues in them
4  regarding, like, the student loan promissory notes,
5  which I was asked about.
6    Q    Have you in any prior case been called upon as
7  an expert to calculate damages for breach of contract?
8    A    No.
9    Q    Okay.  In any other case have you been called
10  upon as an expert to calculate damages on any theory?
11    A    Yes.
12    Q    Okay.  Which cases were those?
13    A    The capping versus not capping forbearance.
14    Q    Any others?
15    A    Possibly.  And I'm just not remembering.
16  Definitely Dawson v. Great Lakes.  And in the
17  bankruptcy cases, among other things, I calculated the
18  cost of attendance on IPEDS data.  That's I-P-E-D-S
19  data.  And the amounts over the cost of attendance were
20  potentially dischargeable.
21    Q    Were the costs of attendance, was that a
22  measure of damages in the case or was it just something
23  you used to get somewhere else?
24    A    Financial need is defined as the difference
25  between the cost of attendance as defined in the Higher



1   receive.

2       Q    Your report includes on pages -- I think it's

3   22 and 23 -- a list of documents you reviewed.

4       A    Yes.

5       Q    Is that an accurate list of all the documents

6   you reviewed?

7       A    That is a list of the documents I reviewed

8   until I submitted the report.

9       Q    Is everything that you reviewed included

10  within that list?

11      A    Everything that I received prior to writing

12  the report and submitting the report is in that list.

13      Q    So there's nothing that you reviewed in

14  connection with this case that is not on that list.

15  Correct?

16          MR. MILLER:  Objection.  It's asked and

17      answered.  Also going to object to the form.

18      That's not what he said.

19      A    So the documents that I reviewed in writing

20  that report are listed in the report.  Nothing that I

21  received prior to submitting that report is not listed

22  there.  So it's a complete list.

23      Q    So, for example, when I look at the list, I

24  don't see a reference to any declarations.  Would it be

25  correct then to conclude that in connection with the



1   report you prepared, you did not review or consider any

2   declarations?

3        A    Declarations like from Mr. Wilner?

4        Q    From anyone.  A declaration from anyone.

5        A    From anyone.  Up until the dates I submitted

6   the report, I didn't read any declarations.  I received

7   Mr. Wilner's report subsequent to that date.

8        Q    Have you received anything else subsequent to

9   your preparation of the report?

10        A    There was one court ruling that I received.

11        Q    What court ruling is that?

12        A    It concerned the judge's ruling on the class

13   certification.

14        Q    When did you receive that?

15        A    Within the last few days.

16        Q    Anything else?

17        A    That's it.

18        Q    Okay.  How long did you spend reviewing the

19   report of Dr. Wilner?

20        A    Probably about 10 to 12 hours.

21        Q    When was that done?

22        A    Soon after I received it.

23            MR. MILLER:  Jon, for clarification, when

24        you're asking about declarations, do you mean

25        separate from exhibits or depositions that are



1      disclosed on the list?  Looking at exhibit --

2              MR. KARDASSAKIS:  Yeah.

3              MR. MILLER:  And I haven't memorized what the

4          exhibits are.

5              MR. KARDASSAKIS:  I mean what I ask.  I mean

6          what I ask.  The transcript reflects what I asked.

7          That's what I'm asking.

8              MR. MILLER:  Okay.  Well, that's why I

9          objected to form because I don't remember --

10             MR. KARDASSAKIS:  Fair enough.

11             MR. MILLER:  But it says here, like, 30(b)(6)

12         dep and Exhibits 1 through 19.  Those were all

13         reviewed and disclosed to you.

14     QUESTIONS BY MR. KARDASSAKIS:

15     Q     The documents that you listed as reviewed, did

16     you review the entirety of those documents?

17     A     Yes.

18     Q     Okay.  So, for example, where you refer to a

19     deposition, you reviewed every page of the deposition.

20     Correct?

21     A     Yes.

22     Q     And other than the documents that are on your

23     list, Class Action Complaint, did you read all of the

24     Class Action Complaint?

25     A     Yes.  It was very tedious.



1    Q    You just said you remember some of the claims.

2   Now you don't remember any of the claims?

3    A    The claims included things like the student

4   activity fees, the housing payments, the course

5   charges, parking fees.

6    Q    Do you know what the legal theories were that

7   were alleged in the Complaint?

8    A    I read the Complaints.

9         MR. MILLER:  He's just asking as you sit here

10       now if you know.  He has the Complaint, too --

11   A    I cannot say right now what the legal theories

12   were.

13   Q    Because you don't remember them?

14   A    Right now, I don't remember them.

15   Q    Was it your task to measure damages for each

16  of the -- based on each of the legal theories in the

17  Complaint or only some of them?

18   A    My task was to measure damages as I saw them

19  with regard to the relationship between GCU and the

20  students.  So there were spreadsheets showing amounts

21  that had been charged, and amounts that had been paid,

22  and amounts that had been refunded.  I analyzed those

23  spreadsheets.

24   Q    There were different legal theories alleged in

25  the Complaint.  What I'm trying to find out is, was it



 1   your task to measure damages assuming the validity of a
 2   particular legal theory, or assuming the validity of
 3   all the legal theories, or something different?
 4          MR. MILLER:  Object to the form.
 5      A    I wasn't asked to evaluate particular legal
 6   theories and then calculate the damages based on that
 7   specific theory.  I was asked to calculate the damages
 8   based on my judgment as to the costs that had been paid
 9   by the students and the costs -- the services and
10   products that I felt they had not received.
11      Q    So when you mentioned your judgment, what is
12   it that you're exercising your judgment on?
13      A    Analyzing data and the spreadsheets that had
14   been provided by GCU to the plaintiff attorneys.  That
15   included ledgers and parking fees that have been
16   received, to determine how much had been paid and to
17   calculate the amount, in my judgment, that the
18   borrowers -- the students should have received.
19      Q    When you refer to your judgment, was part of
20   your judgment to determine what the students'
21   reasonable expectations were?
22      A    Part of my judgment is, you pay for a product
23   or service, you don't receive the service, what would
24   make the bor- -- the student whole.  Sorry I keep on
25   saying borrower for some reason.



1  all in my report.

2      Q    Do you know whether Arizona has law on how you

3  measure damages for different legal theories?

4      A    I'm not an attorney.  I don't know the Arizona

5  laws.

6      Q    Okay.  Is it correct then your task did not

7  involve, for example, trying to measure what damages

8  could be awarded under Arizona law on an unjust

9  enrichment theory?  That's just simply not something

10  you undertook to do.  Correct?

11      A    I was not asked to do that.

12      Q    You keep going back to what you were asked.

13  And I'm not asking about what you were asked now.  Now

14  what I'm asking about is what did you do.  Whether or

15  not you were asked.  I'm trying to find out what it is

16  you did.  Okay?  So you don't need to keep telling me

17  what you were asked because we already covered that

18  earlier in the deposition.  Now I'm trying to find out

19  what you did.  Not what you were asked.  Fair enough?

20      A    Yes.

21      Q    Okay.  So --

22      A    I should also point you to the section on page

23  3 of my report which I described what I believed should

24  be reasonable expectations for the class members in my

25  report.  You keep on asking me about the same thing.



1    Q    What I'm asking now is, did you undertake to

2    try and measure damages that would be awardable under

3    Arizona law, specifically on an unjust enrichment

4    theory?

5    A    No.

6    Q    Okay.  Did you undertake to measure damages

7    that are awardable under Arizona law specifically on a

8    breach-of-contract theory?

9    A    No.

10   Q    Did you undertake to measure damages that

11   could be awarded under Arizona law based on a

12   conversion theory?

13   A    No.

14       MR. MILLER:  Let me object to the form, all of

15       these questions under Arizona law caveat.  Go

16       ahead.

17   QUESTIONS BY MR. KARDASSAKIS:

18   Q    Do you know what the measure of damages is

19   under Arizona law for a breach-of-contract theory?

20   A    No.

21   Q    Do you know what the measure of damages is

22   under Arizona law for an unjust enrichment theory?

23   A    No.

24       MR. MILLER:  Same objection to these

25       questions.  You're asking legal questions to this



 1    witness.  So I'm going to object to form.

 2   QUESTIONS BY MR. KARDASSAKIS:

 3    Q    Does your analysis assume that what we see

 4   discussed in your report as to reasonable expectations

 5   was a part of any of the contracts entered into with

 6   the students?

 7    A    It was not based on the contracts.  It was

 8   based on equity, what would be an equitable refund.

 9    Q    So your analysis is based entirely on an

10   equitable refund?

11        MR. MILLER:  Object to the form.  That's not

12     what the report says.  You're misstating the

13     evidence.

14    A    It's based on my experience working with

15   thousands of students and their families over a few

16   decades on what they typically expect.  If they pay for

17   something and don't receive it, they want a refund.

18    Q    A moment ago when you said it's based on an

19   equitable refund, can you elaborate on that for me?

20   What do you mean by that, based on an equitable refund?

21    A    It's what would be fair.  For example, the

22   housing agreement didn't contemplate a pandemic or

23   other reasons for a student being removed from the

24   dormitory other than conduct.  So one could approach

25   that in one of several ways, one of which would be that



1        you keep interjecting, we both know is improper.

2        You're not allowed to coach the witness during the

3        deposition the way you have been.  So I would urge

4        you to cease that improper coaching.

5             MR. MILLER:  I'm not going to respond to the

6        lecture.  My objection stands.  You can answer, if

7        you understand the question.

8        A    Please repeat the question.

9             MR. KARDASSAKIS:  Ms. Reporter, could you

10       please read back the question.

11            (The following question was read by the

12       reporter: "Question:  So is it fair to say then

13       what your report tells us is the dollar amount that

14       you think would be an equitable refund?")

15       A    My report calculates the amount that would be

16   an equitable refund to make the students whole.

17       Q    And in terms of what's equitable, that's based

18   your judgment based on your years of experience?

19       A    Yes.

20       Q    Is your judgment as to what's equitable guided

21   at all by any provisions of Arizona law?

22            MR. MILLER:  Object to the form of the

23       question.

24       A    No.

25       Q    Does your analysis assume that if GCU's



1   products that the students did not receive.  I am not

2   an attorney.  I'm not familiar with Arizona law.  So I

3   can't say whether the amount that the students didn't

4   receive or the amount of their other expenses that they

5   incurred as a consequence of GCU's actions should be

6   provided as a refund to them.  I'm just saying that

7   they paid for something they didn't receive.

8       Q    I'm asking specifically if the student moved

9   out and incurred hotel charges to live somewhere else,

10  do you know whether that's something that's recoverable

11  under Arizona law on a breach-of-contract theory?

12           MR. MILLER:  I'm going to restate and

13       incorporate my prior objections to this question,

14       as I fully stated here.

15       A    I don't know Arizona law.  Therefore, the

16  answer is, I don't know.

17           MR. MILLER:  Look at the time, if you need a

18       break --

19           THE WITNESS:  Let me check my blood sugar.  My

20       blood glucose is at 128.  I'm fine for another few

21       minutes.

22  QUESTIONS BY MR. KARDASSAKIS:

23       Q    I know the answer to this, but let me just ask

24  to be sure we get it in the record.  Under your model

25  of what you believe students should be paid in



1  connection with this case, you do not make any effort

2  to determine whether any students incurred any

3  out-of-pocket expenses to find alternate housing.

4  That's just simply not anything you've undertaken to

5  measure or include in your analysis.  Correct?

6      A    Correct.

7      Q    And the same would be true with regard to any

8  type of out-of-pocket expense.  So, for example, if a

9  student traveled to go home to live instead of

10  continuing to live on campus for the rest of their

11  semester, you don't in any way take into consideration

12  that travel expense and consider whether or not that

13  should be awarded as damages.  Correct?

14      A    Correct.

15      Q    So is it your view that if the students are

16  entitled to recover those sorts of out-of-pocket

17  expenses, that should be added on in addition to what

18  your analysis says they should be paid or is your

19  analysis going to be everything that the students

20  should be paid, so they shouldn't be paid both?

21          MR. MILLER:  I'm going to object to the form

22      of the question.

23      A    That is a hypothetical.  My focus was on the

24  amount the students paid, and the amounts they didn't

25  receive, and, therefore, the amount that they should be



 1   on different dates.  It's not clear to me whether that

 2   is accurate.  There appears to be some assumption that

 3   if a student accessed their dorm room, that they were

 4   living in the dorm room.  But my belief is that the

 5   students were simply accessing their belongings that

 6   were in the dorm room.  But I have no data to evaluate

 7   that one way or another.  I don't have the key fob

 8   detailed records to show when they entered, when they

 9   left, the duration.

10       Q    I think my question to you was, did students

11   all leave on the same date or did they leave on

12   different dates?  I'm not sure I heard an answer to

13   that question.

14       A    I believe that most of the students left

15   within a few days.  There were some students, like

16   international students, who didn't leave.  But most of

17   the students left pretty quickly after they were told

18   to leave.

19       Q    Okay.  When you say pretty quickly -- I'm

20   still trying to get an answer to, did they leave on the

21   same day or did they not leave on the same day?

22            MR. MILLER:  If you know.

23       A    Within a few days, is my impression.  But I

24   never received data that showed the exact date that

25   every student left.  I received data concerning their



1   plans, but not what they actually did.

2        Q    When you calculate what you believe the

3   students should be refunded, do your calculations

4   assume that students all left on the same day?

5        A    Yes.  The proration is based on the date they

6   were told to leave the dorm, how many days were

7   remaining.  This is the same methodology that GCU used

8   except it uses a correct calculation of the proration,

9   the number of days.  It doesn't do the 50 percent

10  discounting that they did or the rounding down to a

11  multiple of 10 that they did.  It calculates that there

12  were, for example, 33 days remaining out of 113 days

13  for the housing contract agreement.  Therefore, the

14  proration is 33 and -- 33 or -- I'd have to check my

15  report.  But, by 113.  34, I believe, divided by 113.

16  I'd have to double-check that.  The proration section

17  of my report.  So GCU identified 31 days out of 109

18  days, but that was not based on the housing agreement.

19  It was based on the academics.  And my report looked at

20  the date -- the move-in date of January 4th, and April

21  25, the move-out date.  That's 113 days.  And then 34

22  days that they weren't on campus.  So that's 34 divided

23  by 113 is the appropriate proration.  That applies to

24  housing.

25             Fees related to classes were according to



 1   One of the two.

 2       A    Well, I'm not calculating anything like that.

 3   It was not part of my calculation as to what the

 4   storage expenses were.  And it's a hypothetical.  I was

 5   focused on the actual data from the spreadsheets

 6   provided by GCU.  And those spreadsheets didn't include

 7   amounts incurred by the students for storage.

 8       Q    Under your model, does it matter whether a

 9   student actually moved out of their on-campus housing

10   on March 25 or not?

11       A    Well, the -- if they didn't move out, they

12   were continuing to live in the dorm, then they wouldn't

13   be entitled to compensation for being prevented from

14   living in the dorm.  So international students, for

15   example, had nowhere else to go.  So they remained in

16   the dorm.

17       Q    So those students who stayed in the dorm would

18   not receive any money under your model.  Correct?

19       A    They wouldn't receive any refund of the

20   housing charges because they weren't prevented from

21   receiving housing.

22       Q    And how many students continued to live in the

23   dorm until the end of the semester?

24       A    I believe it was less than 10 percent.

25       Q    And what is that based on?



1    A    The spreadsheet that GCU provided that showed

2    when the students expected to move out.

3    Q    Okay.  So you're looking at the spreadsheet

4    where students reported what their plan was?

5    A    Yes.

6    Q    And you're assuming that all the students

7    followed their reported plan?

8    A    That's correct.

9    Q    So if a student reported that he or she was

10   going to move out on March 25, but, in fact, didn't

11   move out, continued to live in the dorm, under your

12   model, they'd receive a refund even though they

13   remained in on-campus housing through the end of the

14   semester.  Correct?

15        MR. MILLER:  Objection.  That's an incomplete

16     and improper hypothetical.  Object to form.

17   A    I was not provided with data concerning the

18   actual move-out dates.  I was provided with data about

19   the plans.  I based my analysis on the data that I

20   received.

21   Q    So, again, you assumed that everyone moved out

22   on the date they said they planned to move out.

23   A    That's what my analysis is based on.  Yes.

24   Q    Okay.  So if, in fact, students moved out on a

25   different date, then your model wouldn't work very



 1  well.
 2          MR. MILLER:  I'm going to object to the form
 3      of that question.  It assumes facts not in
 4      evidence.
 5      A    GCU did not provide data on the actual
 6  move-out dates of the students.
 7      Q    Consequently, you can't consider what date
 8  they actually moved out.
 9      A    And if GCU doesn't have the data, they can't
10  consider it either.
11      Q    So you're assuming that everyone moved out on
12  the day that they reported they would move out?
13          MR. MILLER:  Object to the form of the
14      question.
15      A    Yes.  That's the only data I had available.
16      Q    Do you know whether Carson Little moved out on
17  the day he reported he would move out?
18      A    I do not know that one way or another.  I
19  remember reading in your expert's report assertions
20  that his key fob was used, but it didn't provide the
21  actual data.  My understanding was that he was
22  accessing his belongings that were in the dormitory,
23  but not living in the dormitory.
24      Q    Let's see then if you agree with the more
25  general proposition, that if a student stayed in his or



```
 1   her on-campus housing until the end of the semester,
 2   that student should not recover any award for housing.
 3   Is that correct?
 4        A    Yes.
 5        Q    So to make a determination as to which
 6   students are, in fact, entitled to recover compensation
 7   for housing, it would be important to know which
 8   students actually moved out before the end of the
 9   semester?
10             MR. MILLER:  Object to the form of the
11        question.
12        A    I was not provided with data on the actual
13   move-out dates.
14        Q    Not my question.  That's not my question.
15   You've already told me several times that.  Let's focus
16   on my question.  If you wanted to accurately determine
17   who is entitled to a refund of housing, you've told me
18   that you agree that if a student stayed in his or her
19   on-campus housing until the end of the semester, the
20   student shouldn't be refunded anything related to
21   housing.  So if you want to award the correct amount,
22   isn't it true you would need data as to whether -- or
23   which students actually remained in their housing until
24   the end of the semester?
25             MR. MILLER:  Object to the form of that
```



1            MR. MILLER:  Objection to the form of his

2      question.  You just misstated his testimony.

3      A    I looked at data concerning when they planned

4  to move out.  Some of them moved out before March 25.

5  Some moved out afterwards.  But most of them moved out

6  within a day or two of that date, is my understanding,

7  based on the spreadsheet of the planned move-out dates.

8      Q    So how about those students that moved out

9  afterwards?  Are they entitled to a full amount of the

10 refund?  Or, would they get some lesser amount if they,

11 in fact, moved out after March 25?

12           MR. MILLER:  Objection to the form of the

13     question.  It assumes facts not in evidence.

14     A    You're also asking me for a legal conclusion

15 as to whether someone who moved out on March 26 would

16 be entitled to the same refund as someone who moved out

17 on March 25th.  And based on the college saying, you've

18 got to move out.  So some students would have maybe

19 gotten plane tickets for March 24 instead of March

20 25th.  The result of the college telling them to -- the

21 University telling them to vacate the campus.

22     Q    Does your model award the same dollar amount

23 for a student who moved out on March 25 as it would

24 award for a student who moved out on April 1?

25           MR. MILLER:  Object to the form.



1      A      The calculation is based on the students

2   moving out on the date -- on that particular date.  It

3   doesn't calculate an extra amount for those who moved

4   out earlier or a lower amount for those who moved out

5   later.

6      Q      Would your model award the same dollar amount

7   for a student who moved out on March 25 as it would

8   award for a student who moved out on April 1?

9      A      I thought I answered that.  Yes.

10      Q      Would your model award the same dollar amount

11   for a student who moved out on March 25 as it would for

12   a student who moved out on April 8?

13      A      Yes.

14      Q      Would your model award the same dollar amount

15   for a student who moved out on March 25 as it would

16   award for a student who moved out on April 22?

17      A      Yes.

18      Q      You've told me now your understanding is that

19   students moved out within a day or two of March 25.

20   What is that understanding based on?

21      A      Based on the plans that were reported to GCU

22   and provided by GCU in a spreadsheet of planned

23   move-out dates.

24      Q      I'm sorry.  Did you say the plans that were

25   reported by GCU?



1       A    GCU provided a spreadsheet of the students'
2   planned move-out dates and whether they received a
3   housing -- partial housing refund or not.  So, based on
4   that spreadsheet, I calculated -- I looked and I saw
5   that most of the students had plans to move out within
6   a day or two of the date that they were told to vacate
7   the campus.
8       Q    So did you make a spreadsheet that showed
9   when -- the particular dates students said they were
10  going to move out or did you just ignore any variation
11  and assume that they all moved out on March 25?
12      A    I assumed all moved out on March 25, or
13  whatever the actual date was.  Yes.
14      Q    Although you saw data that said many of them
15  reported they would move out on a subsequent day?
16      A    I saw a spreadsheet that indicated that some
17  students moved out later.  Not many.
18      Q    Okay.  And all --
19      A    And that there were --
20      Q    However many it was, your model would
21  overcompensate them if they, in fact, didn't move out
22  on March 25.  Correct?
23           MR. MILLER:  Object to the form of that
24      question.  Calls for a legal conclusion.  The
25      question was that they'd be overcompensated.



1    Object to the form.

2    A    I calculated based on the dates that they were

3 told to move out.  I did not calculate based on any

4 variations in their planned move-out dates or their

5 actual move-out dates other than the students who

6 didn't move out at all.

7         MR. MILLER:  We'll be coming up on two hours

8    pretty soon here.  So whenever, Jon, you're good

9    for a break.

10        MR. KARDASSAKIS:  As I told the witness, I can

11    take a break whenever he wants.  If the witness

12    would like a break, we can do that.

13        THE WITNESS:  Let me check my blood sugar.

14    It's now 114.  Yeah.  Why don't we take a break for

15    lunch.

16        MR. KARDASSAKIS:  Okay.  How long would you

17    like?

18        THE WITNESS:  However much time it takes to

19    get some food and eat it.  And I eat pretty

20    quickly.  But I have no idea how long it will take

21    us to get food here.

22        MR. MILLER:  We're not in my office.  We're in

23    a conference room.  Could we do 30 minutes?

24        MR. KARDASSAKIS:  Yeah.  That's fine with me.

25    I just want to be sure I don't put the witness in a



1    break now.  That's the proposal?

2         MR. MILLER:  Yeah.  I've got top of the hour.

3    So, ten after.

4         MR. KARDASSAKIS:  That's okay with me.  Let's

5    do that.  Let's take a ten-minute break.

6         (Short break.)

7    QUESTIONS BY MR. KARDASSAKIS:

8    Q    Okay.  Is it correct, Mr. Kantrowitz, that you

9    did not go to law school?

10   A    That's correct.

11   Q    Okay.  And you have no legal training.

12   A    That's correct.

13   Q    You've never published in a legal journal.

14   Correct?

15   A    No.

16   Q    What is your connection with the website --

17   A    I should clarify.  No means I have published

18   in some legal publications.

19   Q    I think the question was, have you published

20   in a legal journal.

21   A    Counsel in Law in Higher Education.  I don't

22   know if that's considered a journal or not.

23   Q    What is your connection with the website,

24   savingforcollege.com?

25   A    I previously served as publisher and VP of



1   areas of expertise.

2        Q    How about that sentence?  Did you write that

3   sentence?

4        A    That is different than what I originally

5   wrote, but pieces of it are similar to things that I

6   write.

7        Q    Who decided that you are a nationally

8   recognized expert on student financial aid,

9   scholarships, and student loans?

10       A    I have won a few awards for my expertise.

11  I've been quoted in more than 10,000 newspaper and

12  magazine articles that -- relating to the subjects of

13  student financial aid, FAFSA, scholarships, student

14  loans, and so on.  And in many of those articles I'm

15  referred to as an expert.  College financial aid

16  administrators often rely on my expertise.

17       Q    The model that is discussed in your report, is

18  that a model that you developed, so it's your original

19  work, or did you copy that from some other source?

20       A    My original work.

21       Q    So is it correct I wouldn't be able to look at

22  a professional journal or treatise and find anywhere

23  where any published work says, this is the way you

24  should calculate awards for this type of case?

25       A    Correct.



1      Q    Has it been peer reviewed at all?

2      A    No.

3      Q    This just simply reflects your opinion of how

4   compensation should be awarded in this case?

5      A    Correct.

6      Q    Did you review any professional materials to

7   see whether your model is in accord with published

8   professional standards or not?

9      A    No.

10      Q    So is it fair to say you have no idea whether

11   your model is consistent with or inconsistent with

12   published standards for awards in these type of cases?

13      A    Correct.

14      Q    Okay.  Let's talk about the housing claim.  I

15   see from your report that you reviewed what's described

16   as the Little housing contract e-mail, PL000346-348.

17   Did you review anything else that you think constitutes

18   part of any agreement between the University and

19   Mr. Little regarding his housing?

20      A    There was a University calendar that I

21   reviewed.  There were also some documents about the

22   date the students were told to vacate, which is not

23   that March 25th date.  It's March 23rd.  There was a

24   handbook.  And I believe there were some e-mail

25   messages that were in one of the exhibits.



1     Q    Did you see as an exhibit to one of those

2    depositions the actual log for Mr. Little's use of his

3    key fob?

4     A    No.

5     Q    Did you make an assumption that students were

6    locked out of their housing after March 25?

7     A    I didn't make any assumptions one way or the

8    other.  I was looking at the date they were told to

9    leave the dorm, which was March 23rd, not March 25th.

10    Q    Did you make an assumption that students were

11   locked out after March 23?

12    A    I didn't make any assumptions about being

13   locked out or not.

14    Q    Do you know whether Carson Little stopped

15   using his dorm on March 23?

16    A    Your expert's report says that his key fob was

17   used to enter the dorm.  Doesn't provide any

18   information about duration.  It seems to imply that he

19   was staying there, when there was no evidence provided

20   to that.  So I can't -- I haven't examined the logs, so

21   I don't know.

22    Q    Did you make any inquiry as to when Carson

23   Little turned in his key fob?

24    A    No.

25    Q    Did you make any inquiry as to whether there



1   was any point in time where his key fob stopped working

2   before he turned it in?

3      A    No.

4      Q    Do you have any reason to believe the

5   University changed any of the locks on the apartments

6   before the end of the housing term?

7      A    No.

8      Q    Did you assume that Carson Little turned in

9   his keys on March 23?

10     A    No.

11     Q    Did you make any assumption as to when he

12  turned in his key?

13     A    No.

14     Q    Did you assume any students were evicted

15  before the end of the semester?

16     A    No.

17     Q    Do you know what day Carson Little moved his

18  belongings out of his apartment?

19     A    No.

20     Q    In your report, when you refer to, stop making

21  the student's housing -- stop making available the

22  student's housing -- the correct phrase from your

23  report -- stop making available the student's housing.

24  When students had keys to their apartment, and had the

25  ability to go in, was the housing available to them?



 1  training do you have that makes you an expert on what
 2  would be reasonable?
 3          MR. MILLER:  Object to the form of the
 4      question.  You're misstating the evidence.
 5      A    You asked about training.  I don't have
 6  training relating to that.
 7      Q    And what training do you have that makes you
 8  an expert on what would be fair?
 9          MR. MILLER:  I'm going to again object to the
10      form of the question.  I don't understand fair in
11      terms of, what?  Fair damages that he's calculated?
12      Fair feeling?  I'm not understanding.  If the
13      witness understands, you can answer.  I'm objecting
14      to form.
15      A    So my basis is largely mathematical in nature.
16  And based on the common sense that you pay for
17  something, you should get it.  You don't receive it,
18  then you should get a refund.
19      Q    What training do you have that makes you an
20  expert on what's fair?
21          MR. MILLER:  Same objections.  Same question.
22      Same objections.
23      A    Not specific about what is and isn't fair,
24  but, rather, a high moral standard.
25      Q    What shows you have a high moral standard?



1           MR. MILLER:  Again, object to the form and

2       scope.  We're way beyond the expert report

3       and opinions that have been tendered in the case.

4       Go ahead.

5       A    I mean, growing up I studied ethical systems

6   and ethical logic.

7       Q    Do you have any other training that you think

8   relates to your ability to assess what's a reasonable

9   expectation?

10           MR. MILLER:  Jon, can you just show me

11       where -- I mean, I know you don't like me talking,

12       but where is this -- what are we talking about

13       against the report here?  When I read the

14       reasonable expectations, none of what you're asking

15       about is talked about.  We're here for an exert

16       deposition based on expert opinions we've offered.

17       You're taking the word reasonable expectations.

18       You're ignoring what the opinions actually say.

19       And now we're talking about moral standards.  How

20       are we in scope?

21           MR. KARDASSAKIS:  Yeah.  I'm not going to

22       answer --

23           MR. MILLER:  How are we in scope?

24           MR. KARDASSAKIS:  His report talks about

25       reasonable expectations.  That's what I'm asking



```
 1     about.
 2          MR. MILLER:  Yeah, but let's talk about those
 3     expectations that are in there which talk about the
 4     things you pay for and what you should be
 5     receiving.  We're off in philosophical theory land.
 6          MR. KARDASSAKIS:  I don't necessarily agree
 7     that he has any expertise on reasonable
 8     expectations, but his report purports that he does.
 9          MR. MILLER:  We're off in philosophical --
10          MR. KARDASSAKIS:  Okay, Matt.  I'm not going
11     to argue with you.  My question stands.
12  QUESTIONS BY MR. KARDASSAKIS:
13     Q    What training do you have to determine what's
14  a reasonable expectation?
15          MR. MILLER:  And I'm going to object again to
16     form.  And I would just caution the witness to
17     answer based on your report.  We don't need to be
18     in philosophical moral ethical --
19          MR. KARDASSAKIS:  I'm not -- I don't agree
20     with counsel's limitation on my question.  My
21     question stands.
22  QUESTIONS BY MR. KARDASSAKIS:
23     Q    What training do you have that gives you
24  expertise on determining reasonable expectations?
25     A    One of my undergraduate degrees is in
```



1   philosophy.

2        Q    Is that it?  Anything else?

3        A    I spent 12 years studying various moral

4   ethical systems in elementary, secondary school,

5   including things like various religions, their moral

6   standards, and Talmud, the bible, things like that.

7   Apparently, GCU doesn't seem to focus on.

8        Q    Anything else that makes you an expert on

9   determining reasonable expectations or have you told me

10  all of it?

11            MR. MILLER:  I'm going to object to the form.

12       Again, reasonable expectations, opinions stated

13       versus reasonable expectations of Gandhi or

14       whatever we're talking about here now with

15       religious philosophy.

16       A    And I think I've covered the basics.

17       Q    Let's discuss the provision of food services.

18  Did you review any writings that described what it was

19  that the University promised with respect to food

20  services?

21       A    I read the section of the handbook relating to

22  food services.

23       Q    Anything else?

24       A    Some of the exhibits may have touched on it.

25       Q    Did they?



1        A     I don't recall specifically.  They did refer
2   to the provision -- allowing the students to keep their
3   Dining Dollars rolled over to another year.  And that
4   students who were graduating would get a refund.
5        Q     What food facilities did the University
6   promise to have?
7        A     I don't know.
8        Q     What days or hours of operation did the
9   University promise for food services?
10       A     I don't know.
11       Q     Which of the food facilities on campus
12  remained open every day until the end of spring, 2020?
13       A     My impression was that a grocery store
14  remained open and that some of the facilities allowed
15  boxed lunches be taken out.
16       Q     Which ones?
17       A     I don't recall which.
18       Q     How many?
19       A     My recollection was that it was a small
20  number.
21       Q     How many?
22       A     I don't have an exact number.
23       Q     What's your best estimate?
24       A     A handful.
25       Q     What did the University do that you consider



1    to be a breach of any promise in connection with

2    providing food service?

3        A    Well, if a student had to vacate the campus,

4    they weren't on campus to be able to use their Dining

5    Dollars.

6        Q    That's it?

7        A    It wasn't available to them.  If the student

8    went home, they couldn't use the Dining Dollars to buy

9    food.

10       Q    Did some students continue to use Dining

11   Dollars even after March 25?

12       A    According to Mr. Wilner's report,

13   approximately $400,000 of Dining Dollars was used

14   subsequent to the move-out date.  It didn't specify

15   whether this was just the students who remained on

16   campus.  And that was only about 10 percent of the

17   remaining balance.  So most students weren't able to

18   use it.

19       Q    Is that a yes, some students did continue to

20   use their Dining Dollars after what you're calling the

21   move-out date?

22       A    Yes.

23       Q    Okay.  And how did you take that into

24   consideration in your calculation?

25       A    I didn't because that information wasn't



1    QUESTIONS BY MR. KARDASSAKIS:

2        Q    Are you backtracking on that?

3             MR. MILLER:  I'm going to object to the form

4        of that question.  He didn't say that anywhere.

5        You know what the documents say full and well.

6    QUESTIONS BY MR. KARDASSAKIS:

7        Q    So is it your view that the University told

8    all students they had to leave campus in the spring of

9    2020 semester?

10            MR. MILLER:  I'm going to object to the form

11       of the question.

12       A    The e-mail message that I saw didn't narrow it

13   to particular students.  It was to all students with a

14   March 23rd date of when they should vacate the campus.

15       Q    Was that a March 23rd date that they needed to

16   leave or leave by March 25 if you want to be eligible

17   for the refund credit?

18       A    March 23rd was the date they were told to

19   leave the campus.  March 25 was the date that the

20   University set for them to receive their partial

21   refund.

22       Q    I'm still trying to understand what it is that

23   you think happened on March 23.  Was it on March 23

24   that the University announced the housing refund policy

25   or are you talking about some other communication on



1    March 23?

2        A    March 23 is when the students were told to

3    vacate the campus.  March 25 is the date the college

4    subsequently announced for qualifying for a refund.

5        Q    So the two are not the same event.  You're not

6    talking about a campus refund policy that was issued on

7    March 23.  You're talking about some other

8    communication on March 23.  That's what you're telling

9    me?

10       A    March 23 is the date they were told to leave

11   the campus.

12       Q    Okay.  And that's in an e-mail that you saw?

13       A    Yes.

14       Q    Do you know whether some students continued to

15   park their cars on campus even after they left?

16       A    I have no information one way or another.  If

17   you provide with me with that information, I can answer

18   that.  Otherwise, that wasn't something that I reviewed

19   for my report.  And what I did review is discussed in

20   my report.

21       Q    If a student continued to park their car on

22   campus, did they get a benefit from paying the parking

23   fee?

24       A    That's a hypothetical.  What I did is in my

25   report.  I'm not -- information that I don't have



1       question.   Incomplete hypothetical.  Misstates the

2       evidence.

3            A    I have not seen anything that said that he

4    parked on campus, that he parked in a lot, or why he

5    was on campus.  So I can't answer a hypothetical like

6    that because I don't have complete information.

7            Q    Your analysis assumed that no students who

8    paid the parking fee continued to park on campus after

9    March 25.  Correct?

10           A    Don't make any assumptions.  All I know is

11   that they paid certain amounts and that they were told

12   to vacate the campus on March 23rd.  I don't have any

13   data that says whether or not anybody parked on campus

14   or not.

15           Q    But you propose to give them back money.  Is

16   that based on the assumption that they didn't park on

17   campus?

18           A    I propose that they should be given a refund

19   because they were told they needed to vacate the

20   campus.  And they had paid parking fees for the

21   duration of their stay on campus.  They weren't able to

22   use that based on the date they were told to vacate.

23           Q    The part about not able to use.  Were they

24   not -- you're assuming they were not able to use.

25   Correct?



1     A     I didn't make any assumptions.  All I did is I
2  calculated based on the date they were told to vacate
3  the campus.
4     Q     So under your analysis you would refund part
5  of the parking fee whether or not students continued to
6  park on campus after March 25.  Correct?
7     A     March 23rd, not March 25.
8     Q     Okay.  March 23.  Under your analysis you
9  would refund part of the parking fee to students
10  whether or not that student continued to park on campus
11  after March 23.  Correct?
12     A     It's based on the date that they were told to
13  vacate the campus, not some hypothetical for which I
14  don't have any data whether they parked on the campus
15  or not.  If you give me data that shows that students
16  didn't -- continued to park on campus, that tells me
17  all those details, then maybe I'd consider something
18  different.  But I'd have to see that before I would
19  make a decision.
20     Q     The analysis reflected in your report makes no
21  distinction between a student who parked on campus and
22  didn't park on campus after March 23.  Correct?
23     A     Correct.
24     Q     Okay.  In your report on page 3 you talk
25  about, for example, when students pay an on-campus



 1  information that has a bearing on this.  So, no
 2  changes.  Now, I did describe the meal plan fees.  So,
 3  from your expert's report, potentially we could refine
 4  that.  But I don't have any of that information, so I
 5  can't reach a conclusion.
 6      Q    I'm not trying to argue with you.  I just want
 7  to ask.  Are you planning to change any of these or
 8  not?
 9      A    Not at the present time.  If I get more
10  information, I will evaluate it.
11      Q    Okay.  One of the other topics I wanted to ask
12  about is working papers or notes.  Did you prepare
13  notes when you were doing this work?
14      A    No.  The report, draft report, was where I
15  wrote everything.  The spreadsheets, I did analysis
16  within the spreadsheets.
17      Q    Do you have any working papers?
18      A    No.
19      Q    And you never did have any working papers or
20  notes.  Correct?
21      A    Correct.
22      Q    So if anybody wanted to check any of your work
23  and calculations, is there any back-up documentation
24  that exists that allows it to be checked?
25      A    No, but the report says what I did.  They can



1    A    My understanding is there were some

2   international students who remained on campus.

3    Q    Was it your understanding it was only

4   international students who remained on campus?

5    A    There were also some students who appealed for

6   special circumstances such as they didn't have a home

7   to go back to.

8    Q    Okay.  So it was your understanding there was

9   international students and students who had special

10  circumstances who remained on campus.  Correct?

11   A    Yes.

12   Q    Okay.  And did you conclude none of them

13  parked on campus?

14   A    I didn't have any information about whether

15  they did or didn't have cars there.  So I was doing my

16  analysis based on the fact that students were told to

17  vacate.  And, therefore, didn't have access to the

18  parking lots.

19   Q    But you knew some international students

20  remained and some students with special circumstances

21  remained.

22   A    Yes.

23   Q    And did you assume that none of those students

24  parked on campus?

25   A    I didn't make any assumptions one way or



1  another about that.  I was doing the calculation based

2  on the date the students were told to vacate the

3  campus.

4      Q    And did you assume that those international

5  students and those students with special circumstances

6  had no ability to use the health center on campus?

7      A    I didn't make any assumptions one way or

8  another about that.  I was just looking at the case

9  that students were told to vacate.  If you're not on

10  campus, you can't use those parking lots or other

11  facilities.

12      Q    Doesn't your report assume that none of those

13  students remained on campus?

14      A    My report focuses on what they were told and

15  when they were told it.  I didn't consider that a small

16  number of students may have remained on campus.

17      Q    What is it about these documents or any

18  documents that tells you it was a small number of

19  students who remained on campus?

20      A    Your expert's report provides information that

21  suggests a small number.  The number -- the Dining

22  Dollars that were used throughout the remainder of the

23  term were only about 10 percent of the refunds that

24  were due.  That suggests a small number.

25      Q    At the time you wrote your report did



1  ever asked or should have asked, I suppose, you're an

2  expert --

3          THE COURT REPORTER:  I'm sorry.  Please repeat

4      your question.

5  QUESTIONS BY MR. MILLER:

6      Q    What is your area of expertise that you're

7  testifying on in this case?

8      A    My area of expertise is the financial aspect

9  of planning and paying for college such as college

10  costs and the money that students pay for those college

11  costs.

12      Q    And as part of that area of expertise are you

13  familiar with the services or facilities that are to be

14  provided for the costs that colleges charge?

15      A    Yes.

16      Q    And do you believe that the knowledge you have

17  is greater than the knowledge that the layperson would

18  have on these issues?

19      A    Yes.  College costs and financial aid and ways

20  people pay for college are very complicated subjects.

21  I get questions all the time from families and even

22  financial experts about how it works in reality.

23      Q    Okay.  And are you a professional testifying

24  witness?

25      A    No.



EXHIBIT 3

```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3

4

5   Carson Little, individually   )
    and on behalf of all others   )
6   similarly situated,           )
                                  )No. 2:20-CV-00795-SMB
7                  Plaintiff,     )
                                  )
8   vs.                           )
                                  )
9                                 )
    Grand Canyon University,      )
10                                )
                   Defendant.     )
11  _____)

12

13

14      VIDEOTAPED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

15          GRAND CANYON UNIVERSITY - JUNETTE WEST

16

17

18          Zoom Meeting ID No.: 96860847547
                  October 24, 2022
19                   9:02 a.m.

20

21

22

23  Prepared by:
    SHELLEY HAVERMANN, CR
    Certificate No. 50432
24  Prepared for:
    U.S. DISTRICT COURT
25  (Via videoconference)
```



1   my question then, no, a student can't go to GCU, or

2   couldn't in spring 2020 and say, I only want to pay

3   for 10 days' worth as opposed to the entire

4   semester?

5           MS. HONECKER:  Objection; form and

6   foundation.

7           THE WITNESS:  Yeah.  We don't prorate the

8   fees, no.  That's correct.

9       Q.  BY MR. SOLDATO:  Okay.  And, alternatively,

10  GCU couldn't say, in the spring of 2020, Student,

11  we're only going to provide you student activities

12  for the first 10 days of the semester and keep the

13  remainder of the $300 portion that would have been

14  prorated after that 10-day allotment?

15          MS. HONECKER:  Objection; form, and

16  misstates the witness's testimony.

17          THE WITNESS:  Yeah, I don't understand.  If

18  that's a question, I don't know what the question

19  is.

20      Q.  BY MR. SOLDATO:  Sure.  Do you think under

21  the terms of this University Policy Handbook that

22  GCU could have said, we will only provide student

23  activities for the first 10 days of the semester,

24  the spring 2020 semester?  Is that how you

25  understand this University Policy Handbook to read?



1   not to increase student fees, whether you did so or

2   not, what were the considerations that you took into

3   account to decide whether or not to do that?

4              MS. HONECKER:  Objection; form, foundation.

5              THE WITNESS:  Our campus has been growing,

6   so we look at the operational expenses, the number

7   of students that we have on campus.  There's a lot

8   of factors that go into the whole budgeting process,

9   not just individual -- this individual fee.

10      Q.  BY MR. SOLDATO:  Is one of the factors that

11  you consider the cost of the services that you're

12  agreeing to provide in connection with that fee?

13             MS. HONECKER:  Objection; form, foundation,

14  misstates the witness's testimony.

15             THE WITNESS:  We don't go through a list of

16  things that the fees would cover, no.

17      Q.  BY MR. SOLDATO:  By the way, for the court

18  reporter's sake, you mentioned a few names before.

19  Sarah Boeder?

20      A.  Yeah, Boeder.

21      Q.  That's Sarah with an H, correct?  Is that

22  correct, she has an H at the end of her name, Sarah?

23      A.  Yes.

24      Q.  S-A-R-A-H?

25      A.  Yes.

