# Exhibit 1

1  Adam J. Levitt*
2  Laura E. Reasons*
   Peter C. Soldato*
3  **DiCELLO LEVITT LLP**
   Ten North Dearborn Street, Sixth Floor
4  Chicago, Illinois 60602
   Tel.:  312-214-7900
5  alevitt@dicellolevitt.com
   akeller@dicellolevitt.com
6  lreasons@dicellolevitt.com

7  Matthew S. Miller*
   **MATTHEW S. MILLER LLC**
8  77 West Wacker Drive, Suite 4500
   Chicago, Illinois 60601
9  Tel.:  312-741-1085
   mmiller@msmillerlaw.com
10
   Robert D. Ryan – 014639
11 **LAW OFFICES OF ROBERT D. RYAN, P.L.C.**
   343 West Roosevelt Street, Suite 220
12 Phoenix, Arizona 85003
   Tel.:  602-256-2333
13 rob@robertdryan.com

14  * *Pro Hac Vice*

15  ***Counsel for Plaintiff and the Class***

16
                    **IN THE UNITED STATES DISTRICT COURT**
17                       **FOR THE DISTRICT OF ARIZONA**

18

19 | Carson Little, individually and on behalf others similarly situated, | |
20 | | No. 2:20-cv-00795-SMB |
21 | Plaintiff, | *The Honorable Susan M. Brnovich* |
22 | | **DECLARATION OF** |
23 | v. | **MARK KANTROWITZ** |
24 | | |
25 | Grand Canyon University, | |
26 | | |
27 | Defendant. | |
28

**DECLARATION OF MARK KANTROWITZ**

I, Mark Kantrowitz, declare and state under penalty of perjury:

1. I am an expert in the costs and financing of higher education. Based on my experience and the materials I reviewed in this case, I submitted an expert report calculating the damages in this case as between $19,969,420.35 and $21,377,324.95.

2. In this declaration, I will provide information about my background and expertise and will address some of the issues Defendant Grand Canyon University raised in its motion to exclude my opinions.

### I.     Professional Background

3. I am the President of Cerebly, Inc. and the Publisher of the website PrivateStudentLoans.guru and StudentAidPolicy.com. I also am a prior publisher of the following websites: Savingforcollege.com, Cappex, Edvisors, EduPass, Fastweb and FinAid.

4. I have spent the past 30 years working in college costs and financing. This is a complex subject that people often have difficulty understanding without expert help. Through my work, I provide practical information, advice, and tools to students and their families so they can make informed decisions about planning and paying for college. As an expert in college costs and financing, and through all of my experience, I am familiar with the fees and costs charged by colleges and universities, the associated services and facilities schools provide for those fees and costs, and the expectations students have in exchange for the fees and costs paid.

2

5. Through my websites, I have conservatively helped well over 100 million families plan and pay for college over the last three decades.

6. I typically have one-on-one conversations (by phone, email, or in person) with more than 1,000 students and parents per year, so that would yield more than 25,000 over the last three decades.

7. I give periodic talks, at least a dozen a year, sometimes as many as 40 in a year. The audience is usually more than 100 and sometimes as many as 4,000. Many of these talks are to financial aid professionals, not families, and I also give a few lectures each year to families, such as at specific secondary schools. For example, I would give talks every few years to families at Spanish River High School at the request of the Florida Congressional delegation with a typical audience of 400. Other examples include lectures at Brooklyn Friends School, Hewitt School, and Arcadia High School, as well as College Week Live (online college fair).

8. Through my work and over the years I have reviewed data collected and maintained by the Department of Education through what is known as IPEDS, or Integrated Postsecondary Education System. The U.S. Department of Education gathers information from every college and university that participates in the federal student financial aid programs concerning their costs of attendance concerning the costs of higher education. GCU participates in federal financial aid programs and is required to report accurately to IPEDS.

9. IPEDS, as described on its website, "provides basic data needed to describe — and analyze trends in — postsecondary education in the United States, in terms of the

numbers of students enrolled, staff employed, dollars expended, and degrees earned. Congress, federal agencies, state governments, education providers, professional associations, media, students and parents, and others rely on IPEDS data for this basic information on postsecondary institutions."[1] Students and families can also obtain this information through the U.S. Department of Education's College Navigator website which is based on IPEDS or through college search websites directly which is also based on this same data.

10. I am familiar with IPEDS and how that information is used by students, families, and universities to determine the overall costs and the net costs of attendance. Over the course of my career, I have reviewed and analyzed the IPEDS data.

11. Colleges and Universities must abide by the costs and fees as reported to IPEDS and this information is made available to students and families so that they know the true costs of attendance.

12. Students do not have a say in the costs they will pay other than through the school they choose and the courses they select to take.

### A. Publications, News Stories, and Board Work

13. I have been quoted in more than 10,000 news stories on issues concerning higher education costs, including issues related to college shutdowns due to COVID-19 in the Spring of 2020. I have written on topics concerning the costs of higher education

---

[1] *See* https://nces.ed.gov/ipeds/about-ipeds

for *The New York Times, Wall Street Journal, Washington Post, Reuters, Huffington Post, U.S. News & World Report, Money Magazine,* and others.

14. I have appeared on television programs to discuss the costs of higher education on NBC News Now, CBS News, CGTN America, Cheddar, MarketWatch and other news outlets.

15. I have served on the Editorial Board for the Council of Law in Higher Education and published articles in the Council of Law in Higher Education, including the following:

    a. Mark Kantrowitz, Financial Aid (Chapter 1) in Annual Review of Higher Education Law & Policy – Major Developments from 2008, Daren Bakst, editor, Council on Law in Higher Education, May 2009.

    b. Mark Kantrowitz, Overview of Student Aid Changes in the Recent Reconciliation Legislation, Marketplace of Ideas, Council on Law in Higher Education, April 14, 2010.

    c. Mark Kantrowitz, The Economic Stimulus Bill and Higher Education, Higher Education Issue Briefs, Council on Law in Higher Education (CLHE), January 23, 2009.

    d. Mark Kantrowitz, American Recovery and Investment Act of 2009, CLHE Higher Education Issue Briefs, Council on Law in Higher Education, January 19, 2009.

5

e. Mark Kantrowitz, Withholding Academic Transcripts and Diplomas, Regulatory Advisor, Council on Law in Higher Education, June 2007.

f. Mark Kantrowitz, Analysis of the College Student Relief Act of 2007, Emerging Issues in Financial Aid, Council on Law in Higher Education, Volume 1, Number 1, January 23, 2007.

g. Mark Kantrowitz, Student Aid Impact of the Higher Education Reconciliation Act of 2005, Regulatory Advisor, Council on Law in Higher Education, Volume 2, Number 2, March 2006.

h. Mark Kantrowitz, Limitations on School Relationships with Education Lenders, Regulatory Advisor, Council on Law in Higher Education, Volume 1, Number 3, May 2005.

i. Mark Kantrowitz, Policing Tax Evasion and Tax Fraud: A Consequence of the Regulations Concerning Conflicting Information, Regulatory Advisor, Council on Law in Higher Education, Volume 1, Number 2, April 2005.

j. Mark Kantrowitz, Recommended Elements of Award Letters, Regulatory Advisor, Council on Law in Higher Education, Volume 1, Number 1, March 2005.

k. Mark Kantrowitz, Comparing Variable and Fixed Interest Rates for Consolidation Loans, Higher Education Briefings, Council on Law in Higher Education, Volume 1, Number 1, September 2004.

l.  Mark Kantrowitz, Defining 'Education-Related Expenses', Emerging Issues in Financial Aid, Council on Law in Higher Education, Volume 1, Number 3, March 24, 2007.

16. The United Supreme Court recently favorably cited on of my works in *Biden v. Nebraska* decision. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (citing M. Kantrowitz, Year in Review: Student Loan Forgiveness Legislation, Forbes, Dec. 24, 2020).

17. I was also curator of the Student Loans Topics Page for the New York Times from 2009 to 2010, and Student Loan Guru for FiLife.com, a Dow Jones property from 2008 to 2010.

18. I am the author of five bestselling books about scholarships and financial aid, including *How to Appeal for More College Financial Aid*, *Twisdoms about Paying for College, Filing the FAFSA*, and *Secrets to Winning a Scholarship.*

19. I've served on the Bankrate Financial Review Board from 2021 to the present, the editorial board of the Journal of Student Financial Aid from 2011 to the present, the editorial advisory board of Bottom Line Wealth and Bottom Line Personal from 2008 through 2023, and the editorial board of the Council on Law in Higher Education from 2004 to 2011. I also served as a member of the board of directors of the National Scholarship Providers Association and am a member of the Board of Trustees of the Center for Excellence in Education.

**B.  Congressional Testimony and Awards**

7

20.     I have testified before Congress and various federal/state agencies on issues relevant to college cost disclosures.

    a.     Mark Kantrowitz, The Challenge of Rising Student Loan Debt, California Student Aid Commission (CSAC), Symposium on Student Debt, 11/14/2014.

    b.     Mark Kantrowitz, Reforming Pell: New Ideas and Research to Improve Student Aid Policy, American Enterprise Institute panel presentation, Rayburn House Office Building, Washington, DC, 12/8/2011.

    c.     Mark Kantrowitz, The Need for Standardized and Required Disclosures Concerning College Costs and Financial Aid, U.S. Department of Education Public Meeting on Recommendations for Improvement of Student Financial Aid Offer Forms and Development of Model Financial Aid Offer Forms, 9/13/2011.

    d.     Advisory Committee on Student Financial Assist., hearing on Congressionally Mandated Institutional Net Price Calculators, 3/17/2011.

    e.     U.S. Senate Comm. on Banking, Housing and Urban Aff., hearing on Turmoil in U.S. Credit Markets: Impact on the Cost and Availability of Student Loans, 4/15/2008. Led to Ensuring Continued Access to Student Loans Act of 2008 (P.L. 110-227 and 110-359).

    f.     Advisory Committee on Student Financial Assistance, hearing entitled Session III: Simplification of Expected Family Contribution Determination, 9/19/2006.

   g. U.S. Senate Committee on Governmental Affairs, hearing entitled The Rising Cost of College Tuition and the Effectiveness of Government Financial Aid, 2/10/2000.

   h. U.S. Senate Judiciary Committee, hearing entitled Solving the Problem of Scholarship Scams, 10/6/1999. Lead to passage of the College Scholarship Fraud Prevention Act of 2000 (P.L. 106-420).

 21. I have received the following awards related to my work in the costs and financing of higher education

   a. National Scholarship Providers Association (NSPA), Distinguished Speaker, 2019.

   b. Fellow of the NSPA, 2021.

   c. College Financing Ace, 2016 IA 25, Investment Advisor Magazine, 2016

   d. Excellence in Financial Literacy Education (EIFLE) Award, Institute for Financial Literacy, 2015.

   e. Money Hero, Money Magazine, 2012.

   f. Creative Leadership Award, California Association of Student Financial Aid Administrators, 2011.

   g. Distinguished Service Award, California Association of Student Financial Aid Administrators, 2022.

   h. Above & Beyond Citizen Honors, Pennsylvania State Finalist, Congressional Medal of Honor Society, 2008.

    i.  Meritorious Achievement Award, National Association of Student Financial Aid Administrators, 1996.President's Award, National Association of Graduate and Professional Students, 1996.

22.  To the extent my math skills are at all in question, I received the National Science Foundation Graduate Fellowship, 1990-93, and the Hertz Foundation Research Fellowship Grant. I also won the Courant Institute Prize for Mathematical Talent, 2nd place, I was a Member of MIT Putnam team in 1985 and 1988. I ranked 10 in the USA Mathematical Olympiad in 1983 and 17th in 1984 and was invited to train for U.S. Olympic Math Team in each year. I was ranked number one in the Massachusetts State Math Olympiad in 1984-1985 and ranked number one in the Continental Math League with a perfect score in 1982. I also am the inventor on several patents involving statistical analysis and modeling.[2]

## II.  Opinions in this case

23.  I am familiar with the fees that colleges charge and the services they provide in exchange for those fees. I have reviewed materials provided to me in this case, including materials from the Defendant, Grand Canyon University, and I am familiar with the fees the Defendant charged in the Spring of 2020.

24.  Based on my experience, expertise, and review of materials related to this lawsuit, I determined that the value of the services that were not provided in the Spring of

---

[2] See U.S. Patents 11,288,747; 7,778,847; 7,523,043; 6,978,419; 6,622,140; 6,618,697; 6,581,057; and 6,292,772.

2020 is between $19,969,420.35 and $21,377,324.95. These are the damages that should be awarded to the class members in this case.

25. I calculated a range because GCU did not provide full information concerning their Dining Dollars. Based on the information they provided to their own expert and that he described in his report, however, and assuming their expert accurately reported the information he reviewed (which has never been made available to me), then the total damages would be $20,918,350.18 which is within my range and validates my work. This was generally discussed at my deposition.

26. Calculating damages in this case required the review of complex data sets produced by GCU and organizing it into understandable numbers from which a damage calculation can be determined. My methodology is explained in detail in my report.

27. Having reviewed GCU's Motion to Exclude, GCU has misunderstood my opinion. I am not providing an opinion on economic theory. My expertise is in higher education costs and my opinion is based on my decades of experience in this specialty. This has been my life's work for the past 30 years. Indeed, I am uniquely qualified to offer opinions in this case.

28. GCU suggests that my opinion is not based on the contracts but that misconstrues the facts. I reviewed the contracts provided to me as listed in my report, and the contracts, in this case, are consistent with university agreements generally in that they obligate the student to pay certain fees in exchange for which the university will provide certain services and facilities. The contracts do not, however, specify the damages for a failure to perform by GCU. That's where I relied on my experience and expertise to

11

review the data provided by GCU to calculate the value of the services and facilities that were not provided to the students in the Spring of 2020. This is the proper way to determine damages in this case.

29. The data I reviewed is complex and likely would not be readily understandable to a jury. I have spent 30 years learning the ins and outs of college expenses and related financing and advising families, institutions, and government bodies on these issues. I am frequently called on by news outlets as an expert to help people understand the complexities of these issues. I have even been consulted by universities to provide information for their students.

30. In this case, I was able to calculate the value for the breach by looking at the overall value of the services and facilities as determined by GCU and then calculating a pro-rata figure based on when GCU requested students not return. This is a reasonable methodology to value the facilities and services that were not provided, and it is in fact also consistent with how GCU attempted to value services when they miscalculated the housing values that they offered to students. Pro rata is the proper way to value the damages at issue in this case. This calculation provides a reasonable accounting of the actual loss of a promised value to the class members.

31. When I said at my deposition that I thought this was equitable, I did not mean that in a legal sense as GCU suggests. My approach was mathematical, and the outcome is correct and fair.

32. Damages in this case do not require a complex economic analysis, relying on significant assumptions, of "consumer preference" and "supply and demand" of

services, when a simple accounting of the services that were contracted to be paid, and then not delivered, can be assessed through observing the transaction value of the services, not a theoretical-based speculation of alternative services that the student might have chosen. Instead, once the data has been compiled and properly understood, reasonable simple arithmetic projections provide the value of the damages in this case.

33. Students are not charged and do not pay based on supply and demand. Students must pay the fees that GCU charges regardless of their individual demand for services, and those fees are not flexible. As mentioned above, the fees charged must be reported to the U.S. Department of Education. There are no substitute services available. The students at GCU have to pay GCU's fees for GCU-provided services and facilities.

34. GCU contends that I did not understand Arizona law. I am not an attorney and am not here to opine on Arizona law. My role, in this case, is to calculate the damages based on the value of the services not provided. That's what I've done. However, since GCU asked at the deposition, I have since learned that Arizona law permits damages in a breach of contract in an amount equal to the value of the things or services that the plaintiff provided to the defendant. This is consistent with my calculations and conclusions.

35. GCU claims that I did not investigate the underlying facts but that is not true. I reviewed the material referenced in my report. If I had to make assumptions, I noted that in my report. GCU argues, for instance, that I should have investigated the specific date when each student left campus but that was not necessary here. For the housing refunds, I followed the methodology used by GCU and corrected for their errors

and improper rounding down to the detriment of the students. GCU did not base its methodology on the specific date when each student left campus. As for GCU's remarks that Little never left campus, that is not what I understand the facts to be based on my knowledge of the facts in this case.

36.     In summary, it is my opinion that the return of value in this matter can be supported by the available data and calculated using a reasonable method, as I have done in this case. These methods included reasonable accounting calculations, using arithmetic estimates when necessary and supported by the facts in the matter. My methodology also is a common-sense approach to making the plaintiff whole for the breach of contract, arriving at a fair outcome by awarding the class proper compensatory damages as a remedy for the breach of contract by GCU. Anybody knowledgeable about the subject matter organizing and reviewing the same data should reach the same result, as it is straightforward mathematics.

Dated: August 14, 2023

_____
MARK KANTROWITZ