# Exhibit 2

**In the Matter Of:**

LITTLE V GCU

2:20-cv-00795-PHX-SMB

---

**MARK KANTROWITZ**

*March 17, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

1

2                  UNITED STATES DISTRICT COURT

3                       DISTRICT OF ARIZONA

4

5

6     Carson Little,              )
                                  )
7          Plaintiff,             )
                                  )
8     vs.                         )No.  2:20-cv-00795-PHX-SMB
                                  )
9     Grand Canyon University,)
                                  )
10         Defendant.             )

11

12

13

14

15

16              DEPOSITION OF MARK KANTROWITZ

17                  (Via videoconference)

18           Taken on behalf of the Defendant

19                      March 17, 2023

20

21

22

23

24

25



1   GCU violated an agreement that they drafted.  So they

2   should refund the full amount.  I happen to feel that

3   proration is fair to both sides.  That it reflects the

4   portion of the services that the students didn't

5   receive.  So, in that case, I argued for proration.

6   GCU even used proration in their calculations.  They

7   used -- they had some errors in their calculations.  So

8   I corrected those errors and calculated what I felt

9   would be a fair reflect- -- what would make the

10  students whole.

11          Now, in the case of the Dining Dollars, there

12  potentially would be the exact amount remaining as of

13  the date they were told to vacate the dorms.  But that

14  information wasn't provided to me.  So I calculated an

15  upper and lower bound of the amount between 20 percent

16  and 30 percent.

17      Q   So is it fair to say then what your report

18  tells us is the dollar amount that you think would be

19  an equitable refund?

20          MR. MILLER:  I'm going to object to the form.

21      Misstates the evidence.  His expert report is a

22      damages report, not a liability report.

23          MR. KARDASSAKIS:  These speaking objection, as

24      you know, are improper.  If you want to object on

25      form, feel free.  But the further discussion that



1        Counsel, is page number 5 also.  Okay?

2             MR. KARDASSAKIS:  I've got it.

3   QUESTIONS BY MR. MILLER:

4        Q    There were a number of questions here asked

5   about the number of days and your opinion that GCU used

6   the wrong calculation.  Do you remember those

7   questions?

8        A    Yes.

9        Q    And you seemed a little frustrated that things

10  weren't -- didn't seem correct, that there were 34 days

11  or 31 days, and March 23rd and March 25.  A bunch of

12  questions on that.  Do you remember those questions?

13       A    Yes.

14            MR. KARDASSAKIS:  Object to the form of the

15       question.

16  QUESTIONS BY MR. MILLER:

17       Q    And, actually, I noticed that when we came

18  back from the break you mentioned something about it.

19  But counsel didn't ask you any questions.  So I want

20  to.  And you had noted three times at 1:22 central

21  time, 1:34 central time, and 1:36 central time, that

22  the date should be March 23rd, not March 25.  Counsel

23  never followed up with what you mean on that.  So I

24  would like to.  What did you mean when you were, it

25  seemed, going out of your way to clarify March 23, not



1   March 25?

2       A      So the paragraph concerning the GCU spring

3   2020 semester.  The full sentence continues, GCU

4   announced that it would provide a housing credit for

5   those students who had moved off campus by the end of

6   the day on March 25th, 2020.  And I got a little bit

7   discombobulated because of counsel's question that kind

8   of steered me towards March 25 being the day they were

9   told to move off campus.  The actual day was March

10  23rd.  I don't mention that in this, but I say GCU's

11  calculation was wrong with regard to the 109 days and

12  31 days in which students were not on campus.  And I

13  refer -- get down to it -- so I say, based on the

14  involved January 4, 2020, the correct move-in date, and

15  April 25, 2020, as a correct move-out date, there are a

16  total of 113 days from January 4, 2020, to April 25,

17  2020, inclusive.  So that is the denominator.  And

18  there were a total of 34 days that students were not on

19  campus.  I didn't refer to the March 23 date, but 34

20  days is consistent with a March 23 date.  And so --

21      Q      So March -- when you were, to use your words,

22  discombobulated, and you seemed frustrated to me, but

23  your word is better, in trying to figure out March 25,

24  that was the date that counsel was asking you about.

25  And that date was not adding up.  Correct?

1       A      Correct.

2       Q      The date that you're using, what you believe

3  should be the correct date to start the calculation and

4  refund is March 23.

5       A      Correct.

6       Q      And do you recall seeing documents or

7  testimony that March 23rd was the Monday students would

8  otherwise come back from spring break?

9       A      That's correct.

10      Q      And do you recall seeing evidence, documents,

11 or testimony, that the University asked people who were

12 not already back, to not come back?

13      A      Correct.

14      Q      And is that why you were using March 23rd as

15 the start date?

16      A      Yes.

17      Q      And we saw one version of the document today,

18 counsel showed you, with the housing refunds that GCU

19 had calculated.  Do you recall seeing that document?

20 It has different dorms and dates.

21      A      Yes.

22      Q      And you've seen documents like that in

23 preparing for your report and deposition.  Correct?

24      A      Yes.

25      Q      When GCU provided the refunds to its students,



1   did it make an individualized determination as to what

2   day they came back and what day they left?

3       A    No.

4       Q    They just used the same calculation for

5   everyone depending on which dorm or apartment they were

6   in?

7       A    That's correct.

8       Q    And then using a set date.  They start on

9   March 25.  Correct?

10      A    Correct.

11      Q    Do you have any idea why they picked March 25?

12      A    That was the date that they used for the basis

13  for the housing credit.

14      Q    Kind of a random date.

15           MR. KARDASSAKIS:  Object to the form of the

16      question.

17      A    It seems to be an arbitrary date to me.

18      Q    Let me rephrase the question so the form's

19  right.

20           Do you know why GCU chose that date of March

21  25?

22      A    I don't know why they used that as the basis

23  for the days not remaining on campus.

24      Q    Okay.  Did you see anything in their expert

25  report that explained in a coherent way to you why



1   March 25th was selected by GCU?

2        A    No.

3        Q    And I believe you commented in answering

4   questions from counsel that GCU also applied a 50

5   percent discount and a rounding down.  Do you remember

6   that testimony?

7        A    Yes.

8        Q    Can you explain what you meant by that?

9        A    So GCU calculated a prorated ratio of 31 days

10  in the numerator and 109 days in the denominator as

11  the -- for their basis for their proration.  They

12  applied that to the housing cost to calculate a credit.

13  But instead of giving that credit, they gave a credit

14  that was half of that amount.  And then they took that

15  amount and they rounded it down to the nearest multiple

16  of 10.

17       Q    When they did that -- how did you find that

18  out?

19       A    Well, I looked at the cost of -- for the

20  semester for each of the facilities.  I looked at the

21  amount that they had shown as the refund that they

22  were -- credit that they were offering.  I saw their 31

23  over 109 days figure.  I saw that they had rounded that

24  as a percentage to 28.4 percent, not using it as a

25  ratio.  And that was consistent with the amount at a 50



```
 1   percent credit.  So I calculate -- I applied that to
 2   the figures for the charges.  And that yielded a figure
 3   that was about half -- half of -- about half of that
 4   was the refund.  I did the calculations.  And was
 5   consistent with the 50 percent.  And then -- but it was
 6   still a little bit -- 50 percent was still a little bit
 7   higher.  But then I compared the difference.  And they
 8   all were consistent with rounding down to the nearest
 9   multiple of 10.
10       Q    Okay.  And did you see anything in any of the
11   evidence or in their expert's report that would explain
12   on a sound basis why that methodology was selected?
13       A    No.
14       Q    Did you see any evidence that Grand Canyon
15   ever told the students that's what it was doing when it
16   was offering its housing credits?
17       A    No.
18       Q    So it was a little bit sneaky.
19            MR. KARDASSAKIS:  Object to the form of the
20       question.
21            MR. MILLER:  I'll withdraw that question.  You
22       don't have to answer that question.
23   QUESTIONS BY MR. MILLER:
24       Q    So you didn't see any communication -- of all
25   the communications you saw to the students that
```



1  explained, we're giving you 50 percent and rounding
2  down the 10 --
3      A    They didn't say that.  They just provided
4  dollar figures.
5      Q    Now, Dining Dollars.  I want to talk on Dining
6  Dollars.  And I was a little bit confused.  So I want
7  to see if we can clear some of this up.  We know that
8  that's a policy at Grand Canyon that any Dining Dollars
9  that you don't use by the time you graduate, you
10 forfeit.  Correct?
11     A    Correct.
12     Q    So based on your experience and college
13 financial planning, would you agree that students that
14 are going to buy campus meal plans, such as Dining
15 Dollars, try to work out how much they're going to need
16 to use each year so they don't end up with wasted money
17 at the end of their career?
18     A    Right.  In fact, the students who are
19 graduating become much more careful to not have
20 leftover money.
21     Q    So each year you try to figure out how much
22 you think you will use because you really don't want to
23 roll it over -- correct?
24     A    Correct.
25     Q    Now, and you're assuming what you're going to



1   buy based on days you expect campus to be open.  That's

2   one factor.  Correct?

3       A    Correct.

4       Q    And the facilities that you know the campus

5   provides throughout its campus.  Correct?

6       A    Correct.

7       Q    So it's not going to be just one grab-and-go

8   place.  Right?

9       A    No.  It's going to be all the various options

10  that when you pay the money for the Dining Dollars that

11  were available, you're expected to continue to be able

12  to use them.

13      Q    So if a student expects, I'm going to spend

14  $300 this year on meal plans because I really like the

15  pizza that they offer, and then the University shuts

16  the pizza down and forces you to roll that over, do you

17  think that's the same as the policy that counsel walked

18  you through with GCU that, hey, you know it's going to

19  roll over, so it's use-it-or-lose-it?  Is that the same

20  thing we're talking about in this case?

21      A    No.

22          MR. KARDASSAKIS:  Object to the form of the

23      question.

24  QUESTIONS BY MR. MILLER:

25      Q    You can answer, if you understood the



1  question.  If you didn't, I'll rephrase.

2      A    I understood the question.  And, in fact, in

3  my report I noted that the students who were graduating

4  had an average Dining Dollars that was lower than the

5  average Dining Dollars for the students who weren't

6  graduating.  So they took it into account when

7  purchasing Dining Dollars to ensure -- to try to ensure

8  that they didn't have money left over.

9      Q    So, basically -- you can tell me if I have

10 this wrong -- that what the University was doing here

11 is they induced students to pay a certain amount for

12 meal plans based on the meal services that they offered

13 when students agreed to pay at the beginning of the

14 year or semester.  Correct?

15     A    Correct.

16     Q    And then when that was taken away, according

17 to counsel's questions, the University's position is,

18 well, too bad.  It will roll over next year.  And then

19 you'll lose it if you don't use it by the time you

20 graduate.  Right?

21         MR. KARDASSAKIS:  Object to the form.

22     A    Correct, with one exception.  For the students

23 who are graduating, they did, indeed, give them a cash

24 refund.

25     Q    But undergraduates, who were not graduating,



```
 1   were now going to be forced to keep extra money that
 2   they would have otherwise planned to spend.
 3        A    Correct.
 4        Q    And they may not have bought again next year.
 5        A    Correct.
 6        Q    So to the extent Grand Canyon wants to point
 7   to their policy and say, look, we always tell you they
 8   can roll over and then expire, in your opinion that's
 9   apples and oranges and inapplicable to what's happening
10   in this case from a college financial planning and
11   payment purposes from an expert opinion?
12        A    Correct.  My expert opinion is that they
13   weren't given the option of choosing to do anything
14   else with the money.
15        Q    And in your expert opinion are universities
16   allowed to charge students fees and then provide
17   nothing in return and keep the money anyway?
18        A    No.  In my experience and expertise, that's
19   not allowed.
20        Q    Would that violate some regulations in any
21   way?
22        A    Yes.
23        Q    So if the University describes a fee, and then
24   charges for it, they have to provide the service they
25   say they're going to provide.  Correct?
```



1       A    Correct, as I've described in my report.

2       Q    Counsel asked a lot of questions about, what

3   about a student nearby, could have driven to campus, if

4   campus was open, and maybe used a lab or a dance

5   studio.  Do you remember those questions, those types

6   of questions?

7       A    Yes.

8       Q    Okay.  So if, in fact, there was someone

9   nearby campus who could, in fact, go to the campus and

10  could, in fact, access a facility and use it -- and I

11  don't know if any of those things are true, but let's

12  just, for the question, assume it.  And Tuesdays they

13  were able to use, let's say, the dance studio.  Would

14  that change your opinion and the calculations as stated

15  in your report at all?

16      A    No.

17      Q    Why not?  If counsel said that the person is

18  using the studio, they're getting a benefit?

19      A    The students paid money to receive a

20  certain -- I mean, access to the labs or to the student

21  activity facilities.  They didn't receive that.  They

22  should have received a refund.  If the College chose to

23  provide them with a la carte access to those

24  facilities -- and I don't know that they did -- then

25  they should have provided the refund and then the



 1  students would have been able to use some of that money

 2  or some other money to pay for those services.

 3      Q     Okay.  So if I understood your answer there,

 4  you believe that -- your opinion is that students were

 5  charged an annual or a by-semester fee for specific

 6  services and facilities that would be provided on

 7  campus.  Correct?

 8      A     Correct.

 9      Q     Whether they used it or not, they'd have the

10  option to as they wanted to.

11      A     Yes, as I said in my testimony.

12      Q     So once that stops, your opinion is that

13  that -- since you're no longer providing the service

14  that was agreed and paid for, that the only thing that

15  could happen, from a higher education accounting

16  perspective, is refund that fee.  Right?

17      A     Correct.

18      Q     And then if the University wants to offer some

19  services, limited or otherwise, to people who can

20  happen to access it -- maybe not if you're living in

21  Montana, but if you're in Phoenix, then they are free

22  to charge a new fee for a new service.  And the student

23  can agree to pay that and then use the service.

24  Correct?

25      A     Correct.  And the service may be different



1   than what was provided before.

2       Q    And certainly not all the students were there

3   that you would have had with you using these facilities

4   because many people went home.  Correct?

5       A    Correct.

6       Q    Did the University do that in this case?  Did

7   you see any evidence that the University refunded fees

8   and then charged a new fee that students could agree to

9   pay if they wanted to use the service?

10      A    No.

11      Q    And when you go to college and you're getting

12  charged, do colleges allow you to pick and choose which

13  fees you're going to pay?  Because counsel asked

14  questions about what if you don't use a facility.  Can

15  a student call up Grand Canyon and say, I'm never going

16  to use the gym, so don't charge me that?

17      A    No.  My experience, colleges don't do that.

18      Q    So they don't charge you based on use.  They

19  charge you based on, you have the ability to use.

20      A    They generally don't do a la carte that you

21  can pay for the gym and not for the pool or whatever.

22      Q    So you're just charged a fee.  And there's a

23  service or facility made available to you.

24      A    A collection of services.  Yes.

25      Q    The other thing that I don't think counsel



1  ever asked or should have asked, I suppose, you're an

2  expert --

3          THE COURT REPORTER:  I'm sorry.  Please repeat

4      your question.

5  QUESTIONS BY MR. MILLER:

6      Q    What is your area of expertise that you're

7  testifying on in this case?

8      A    My area of expertise is the financial aspect

9  of planning and paying for college such as college

10  costs and the money that students pay for those college

11  costs.

12     Q    And as part of that area of expertise are you

13  familiar with the services or facilities that are to be

14  provided for the costs that colleges charge?

15     A    Yes.

16     Q    And do you believe that the knowledge you have

17  is greater than the knowledge that the layperson would

18  have on these issues?

19     A    Yes.  College costs and financial aid and ways

20  people pay for college are very complicated subjects.

21  I get questions all the time from families and even

22  financial experts about how it works in reality.

23     Q    Okay.  And are you a professional testifying

24  witness?

25     A    No.



1      Q      What is your core profession?

2      A      My core profession is writing and answering

3   questions by all sorts of individuals, including

4   companies, financial aid administrators, students, and

5   families, about planning and paying for college.

6      Q      So your professional experience is college

7   planning and college costs and services and facilities

8   that you get for those costs?

9      A      Correct.

10     Q      Including the cost and fees that are the

11  subject of this case.  Right?

12     A      Yes.

13     Q      And that are the subject of the expert opinion

14  report that you provided in this case?

15     A      Yes.

16     Q      Are you offering any opinions on any nuances

17  of Arizona law that counsel asked about?

18     A      No.

19     Q      You also talked about a refund that you

20  thought would be equitable.  Do you remember those

21  questions and answers?

22     A      Yes.

23     Q      When you were talking about equitable, were

24  you talking about a legal definition of claims of

25  equity versus, say, claims of law?



1      A    No.   I was referring to fairness and what
2   people expect to receive in exchange for their money.
3      Q    So am I correct then that what you mean by
4   fairness there is you want to make sure the students
5   receive back what they should receive, not less and not
6   more?
7            MR. KARDASSAKIS:   Object --
8      A    Correct.   Make them whole.
9   QUESTIONS BY MR. MILLER:
10     Q    Go ahead.   You can answer.   Did you answer?
11     A    I -- I thought you said something.
12           MR. MILLER:   He objected to the form of the
13       question.
14     A    So students have an expectation that if they
15   pay money for something, they're going to get it.   And
16   if they don't receive it, it's only fair that they get
17   refunded for the amount corresponding to what they
18   didn't receive.
19     Q    Okay.   How many years have you been working in
20   this field of higher education costs?
21     A    More than three decades.
22     Q    And you mentioned various people who call you
23   for opinions.   I think that -- are you often called by
24   the press?
25     A    I've been interviewed -- well, I've been



1  quoted in more than 10,000 newspaper and magazine

2  articles about planning and paying for college.  I've

3  actually had probably double that number of interviews

4  where I wasn't quoted.

5          MR. MILLER:  I don't have any other questions.

6                  REDIRECT EXAMINATION

7  QUESTIONS BY MR. KARDASSAKIS:

8      Q    What we looked at earlier said that -- I'll

9  point you to the exact page, if you want -- most

10  classes were going to be transitioning to online.  Do

11  you remember that or do you want me to find the exact

12  page?

13     A    It was in one of the two exhibits that you

14  provided.

15     Q    Yeah.  I think if you look at Exhibit 11 on

16  page 6.

17     A    The dear GCU students letter?

18     Q    That's what it starts with.  The third bullet

19  point down.  Following spring break, all but a few

20  classes on our Phoenix campus will continue in the

21  online-only LoudCloud environment.

22          Do you know where that all but a few -- were

23  those the labs?  Were the labs the things that

24  continued in person?

25     A    I don't know that.

