# Exhibit 3

# Expert Report by Mark Kantrowitz

**Table of Contents**

Preface ........................................................................................................................................... 1

Summary of Conclusions ............................................................................................................... 2

Class Members' Reasonable Expectations .................................................................................... 3

Proration ....................................................................................................................................... 5

Housing .......................................................................................................................................... 6

Meal Plans ..................................................................................................................................... 9

Parking ......................................................................................................................................... 11

Activity Fee .................................................................................................................................. 12

Health Fee .................................................................................................................................... 13

Lab Fees ....................................................................................................................................... 14

Materials Fees .............................................................................................................................. 15

Course Fees .................................................................................................................................. 15

Credits vs. Cash Refunds ............................................................................................................. 18

Qualifications ............................................................................................................................... 19

Prior Testimony ........................................................................................................................... 22

Documents Reviewed .................................................................................................................. 22

## Preface

This report summarizes my findings and opinions formed to date concerning the matter of *Carson Little, individually and on behalf of all others similarly situated, v. Grand Canyon University*, Case No. 2:20-cv-00795-PHX-SMB, in the United States District Court for the District of Arizona. More specifically, this report summarizes the student finance information, accounting methods, and calculations that I used to arrive at the amount of refunds due to all students enrolled in on-campus classes at Grand Canyon University ("GCU") for the Spring 2020 semester who were charged and paid fees for services, facilities, resources, activities and/or events that were not provided, in whole or in part, during the Spring 2020 semester ("Class Members").

I reserve the right to supplement and amend my report and opinions to take into account new information learned up to and throughout trial. I am being paid on an hourly basis for this engagement, and my billing rate is $500 per hour.

## Summary of Conclusions

My expert opinion is that Class Members are owed the refunds listed below, and that these refunds must be provided in cash to make Class Members whole. As discussed below, providing refunds as a credit to the students' GCU ledger accounts, as opposed to providing cash refunds, forces students to spend their money within the GCU ecosystem or lose the value, denies students of the ability to use their funds as they choose, and reduces the amount of financial aid students would otherwise receive, and thus does not make students whole.  The opinions expressed in this report are based on my review of documents and information from the lawsuit, my training and experience with respect to finances of higher education, and assumptions as stated in this report.

Throughout this document, I use the term "credit" to refer to an amount of money reflected on the student's ledger account, and "refund" to refer to a repayment of a sum of money in cash to a student.  I use the phrase "Class Members" to mean all members of the Class certified by the Court in this case, *i.e.*, "all students enrolled in on-campus classes at Grand Canyon University ("GCU") for the Spring 2020 semester who were charged and paid fees for services, facilities, resources, activities and/or events that were not provided, in whole or in part, during the Spring 2020 semester."

To calculate the amounts due to the students, I relied on spreadsheets and other documents produced by GCU during discovery. My calculations assume that the documents provided by GCU are based on the most accurate accounting available to GCU, which GCU has confirmed in depositions in this matter. Some of these documents appear to be inaccurate because they seem to be missing students who were owed refunds. For example, two spreadsheets relating to housing refunds do not appear to be aligned, with some information present in one spreadsheet but not the other and vice versa. I calculated a lower bound on the refunds owed to the students based on the information provided in the spreadsheets. In some cases, I was able to calculate a reasonable estimate of the missing information and created a range by adding the estimate to the lower bound. I will review new information as it is received. I reserve the right to supplement and amend these figures to take into account such new information as well as corrections to the GCU documents.

Three spreadsheets provided by GCU in discovery were particularly important to my calculations:

- *GCU-L006598—09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* is a spreadsheet that contains tokenized[1] account charges by GCU relative to all Class Members for the GCU Spring 2020 semester. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 170:4 to 182:9.)

---

[1] "Tokenized" refers to the process whereby students' names were replaced with unique identifiers, known as "Token IDs," (referred to as a "Token_ID" in the various spreadsheets) so that the spreadsheets do not reveal student names. The same unique "Token IDs" were used across various spreadsheets produced by GCU during discovery so that the data can be matched up on a student-by-student basis.

- *GCU-L006599—09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY) is a* spreadsheet that contains tokenized account payments by all Class Members for the GCU Spring 2020 semester.  (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 228:3-14.)

- *GCU-L006607—iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)* is a spreadsheet that contains tokenized parking fees paid by GCU students in relation to the 2019 through 2020 GCU academic year, which included payments by Class Members in the Spring 2020 semester. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 209:15-20.)

The following list shows the total Class-wide cash refund amounts that I have determined are due to Class Members for each fee category, including room and board, charged to Class Members:

- Housing/Room Fees: $12.13 million to $12.18 million
- Meal Plan Fees: $2,697,319.35 to $4,055,223.95
- Parking Permit Fees: $248,239.70
- Activity Fees: $2,244,383.01
- Health Fees: $478,415.32
- Lab Fees: $246,475.60
- Materials Fees: $1,842,367.78
- Course Fees: $80,988.93

Except for the two items that are presented as estimated ranges, the above amounts are definitive figures that are the results of exact accounting and calculations, as explained in detail below.[2]

The total of the cash refunds listed above that GCU owes to Class Members is $19,969,420.35 to $21,377,324.95.

## Class Members' Reasonable Expectations

When students pay a fee to their college or university they have a reasonable expectation that they will receive something for the fee, namely the products, services, facilities, resources, activities and/or events associated with the fee. It is commonly known in higher education that, where specific student fees are delineated by different categories, a student should believe it to be true that they are paying a fee in order to receive some service, resource, or activity respective to each category as described.  The fees that students pay are not an unrestricted gift to the college or university. Rather, the fees are labeled with a specific purpose in mind. This includes fees for housing, meals, parking, student activities, a health center, materials, supplies and equipment. This is part of the agreement and good faith obligation between a college or university and its students.

---

[2] As explained above, the actual owed cash refund amounts may be higher, due to possible errors and omissions in the data provided by GCU.

For example, when students pay an on-campus activity fee each semester, they are entitled to receive some service, resource, or activity in relation to that fee for the entirety of the semester, consistent with the description provided by the school and the norms and practice of the school. This is one of many factors students consider when selecting schools and reviewing their financial obligations and what they can expect to receive in return.

Likewise, when students pay for housing for the semester, they are entitled to stay in the room for the entire semester. When a college or university stops making available the student's housing, for reasons other than student conduct, it must provide a refund to the student.

When resources are eliminated, services are cancelled, or facilities are closed or made unavailable to a student for reasons other than a student ceasing to remain enrolled in the university, the student is entitled to receive full or pro-rata refunds of the fees the student was charged and paid for the associated services, facilities, resources, activities and/or events the student did not receive or have access to. This will make the students whole by compensating them for the benefit that they did not receive. Universities certainly would not allow students to use their services or facilities without paying the required fee, and the reverse is also true: students do not expect to pay for services or facilities that aren't provided.

The reasonable expectation that a student-paid fee covers the cost of a specific product or service (including facilities, resources, activities, and events) is supported by U.S. Department of Education's guidance to college financial aid administrators, of which GCU should have been aware. The U.S. Department of Education's cash management regulations specify that "allowable charges" include "the amount incurred by the student for the payment period for purchasing books, supplies, and other educationally related goods and services provided by the institution for which the institution obtains the student's or parent's authorization." 34 C.F.R. § 668.164(c)(1); this describes institutional charges as paying for specific purchases which the student or parent must be apprised of in advance, and must agree to. The regulations at 34 C.F.R. § 668.41 and 34 C.F.R. § 668.43 require colleges to disclose certain consumer information to the public and to students, including the detailed cost of attending the institution and refund policies, including "other refundable portions of costs paid to the institution." *See also* Mark Kantrowitz, *Defining "Education-Related Expenses"*, Emerging Issues in Financial Aid, Council on Law in Higher Education (CLHE), Volume 1, Number 3, March 24, 2007 (discussing various definitions of education-related expenses in the Higher Education Act of 1965 and the Internal Revenue Code of 1986).

Refunds to students must include, at a minimum, a prorated amount of the fees paid based on the reduction in the amount of time during which the product, facility, resource, activity or service associated with that fee was reasonably available to the students. For example, when Class Members were told by GCU to vacate their campus housing, they should have received a full refund of the prorated housing fee, equivalent to the proportional time remaining in the semester when they were told to go home.   The same principle applies to each of the other GCU on-campus fee categories.

Throughout this report, I explain how I determined the prorated amount of the refunds due to Class Members based on the applicable time period. However, one could also argue that the students should

be entitled to a full refund of all fees paid because GCU did not provide the products and services the students reasonably expected to receive, as the contracts do not provide for proration.

## Proration

In determining the prorated refund amounts owed to Class Members, I used two different proration methodologies, with one set based on the GCU Spring 2020 housing calendar/contract and one set based on the GCU Spring 2020 academic calendar, which have different start and end dates.

Students who paid GCU's Spring 2020 Housing Fee were entitled to live in on-campus housing for the entirety of the Spring 2020 semester, according to the Spring 2020 housing calendar/contract dates. The refund of housing fees should be prorated based on the percentage of days remaining, according to the Spring 2020 housing calendar/contract, and when GCU told students to leave their on-campus GCU housing.

During the GCU Spring 2020 semester, GCU announced that it would provide a housing credit for those students who had moved off campus by the end of the day on March 25, 2020. (*See* 30(b)(6) Deposition of GCU, Designee Tim Griffin, Exhibit No. 4, at GCU-L003091-003093.)  This credit did not make Class Members whole because GCU only provided a credit for roughly half of the amount due, it incorrectly calculated the half, and it should have provided a refund instead of a credit.  The file *GCU-L002900-Pro Rata Refund COVID-19 Room board fees 2019- 2020*, which shows GCU's calculation of the partial pro-rated housing credits it provided to some students, identifies 109 days in the semester, after excluding 4 days in January and 8 days in April. Of these 109 days, it identifies 31 days (28.44% rounded) in which students were "not on campus."

GCU's calculation is wrong.

First, GCU's calculation appears to be based on the end date of instruction and not on the end date of the housing contract. The end date of the housing contract is later than the last day of instruction, since students were entitled to remain in their on-campus housing during exams, and in some cases graduation, which took place after the last date of instruction. The file *Little Housing Contract Email (PL000346-000348)* reflects a housing contract term of August 26, 2019 through April 25, 2020, confirming the later end date of GCU's Spring 2020 semester housing. Second, GCU's proration calculation also incorrectly assumes that GCU on-campus students moved into their on-campus residences on January 5, 2020; but the move-in date was actually January 4, 2020. Indeed, the GCU University Calendar for Spring 2020,[3] indicates a January 4, 2020 move-in date. As such, GCU's calculation yield an incorrect, reduced proration ratio. Third, GCU rounds down to the nearest multiple of 10 after prorating, to its own benefit and to the detriment of the students.

Based on the above, January 4, 2020, is the correct move-in date, and April 25, 2020, is the correct move-out date.  There are a total of 113 days from January 4, 2020 to April 25, 2020, inclusive, and there were

---

[3] Available at page 21 of the Grand Canyon University Policy Handbook 2019-2020 (GCU000033-232).

a total of 34 days that students were not on campus. Accordingly, using the correct dates, the proper proration for housing-related fees should have been 34 of 113 days, or 30.09% rounded.[4]

The 34/113 proration applies to the necessary refunds to Class Members for GCU Spring 2020 Housing/Room Fees, Parking Fees, Student Activity Fees, and Health Fees.

In contrast, GCU Spring 2020 instruction began on January 6, 2020 and ended on April 22, 2020.  (*See* Grand Canyon University Policy Handbook 2019-2020 (GCU000033-232) at p.21).  Accordingly, the proration that applies to the necessary refunds to Class Members for GCU Spring 2020 Lab Fees, Materials Fees, and Course Fees is 31/108 (28.70% rounded).

## Housing

Again, during the GCU Spring 2020 semester, GCU announced that it would provide a partial housing credit for those students who had moved off campus by the end of the day on March 25, 2020.  This limited "housing credit" did not make Class Members whole in regards to housing/room fees paid in relation to the Spring 2020 semester.

For the reasons set forth earlier in the "Proration" section, the file *GCU-L002900 – Pro Rata Refund COVID-19 Room  board fees 2019- 2020* shows that GCU incorrectly calculated the pro-rata percentage at 28.4% instead of 28.44% (31/109 rounded), then discounted it by 50%, then rounded down the result to the next lowest multiple of $10. GCU then issued credits — not refunds — of the resulting amounts to certain Class Members that had left their on-campus residence part-way through the Spring 2020 semester.  All told, this resulted in GCU providing only partial credits to certain Class Members (relative to Housing/Room Fees paid).  These credits were less than half of the correct pro-rata amount. It appears as if GCU reduced the proration to benefit itself to the detriment of the students.  There is no reason for GCU to have discounted its calculation by 50% and to then further round down to the nearest multiple of $10 other than to save money. From my review of the records, GCU never disclosed to the Class Members that this is what it was doing.

This table shows the distinctive data from the aforementioned file in the first four columns, followed by corrected calculations in the last three columns.

| Semester Rate | Pro-rata at 28.4% | Half of pro-rata | Amount | Pro-rata at 31/109 | Pro-rata at 34/113 | Shortfall (Amount minus 34/113 Pro-rata) |
|---|---|---|---|---|---|---|
| $1,875 | $533 | $267 | $260 | $533.26 | $564.16 | $304.16 |
| $2,300 | $654 | $327 | $320 | $654.13 | $692.04 | $372.04 |
| $2,500 | $711 | $356 | $350 | $711.01 | $752.21 | $402.21 |
| $2,900 | $825 | $412 | $410 | $824.77 | $872.57 | $462.57 |

---

[4] To ensure that the results are accurate, the exact ratio, 34/113, should be used when determining the proper amount of proration, and not the rounded percentage.  I used only exact ratios in the calculations discussed in this report.

| $3,150 | $896 | $448 | $440 | $895.87 | $947.79 | $507.79 |
| $2,900 | $825 | $412 | $410 | $824.77 | $872.57 | $462.57 |
| $3,200 | $910 | $455 | $450 | $910.09 | $962.83 | $512.83 |

The semester rate column differs depending on the specific residence hall and occupancy, with higher amounts for a single occupancy than for double occupancy, and higher amounts for double occupancy than for triple occupancy. The semester rates were as follows:

- Single Occupancy (All Other Residences): $3,200
- Single Occupancy (North Rim Apartments): $3,150
- Studio Single (Papago Hall): $2,900
- Double Occupancy (North Rim Apartments): $2,900
- Double Occupancy (Canyon Hall and Cypress Hall): $2,300
- Double Occupancy (All Other Residences): $2,500
- Triple Occupancy: $1,875

GCU's accounting spreadsheet *GCU-L006598 09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* includes 45,355 rows with a BillCode of ROOM, covering 14,585 distinct Token ID values. Of these, 10,027 had a Category of Housing-Early Move-Out Credit. The BillCode ROOM refers to amounts billed in relation to the housing/room and board contract amounts paid by Class Members. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 186:19-25.)

Of the rows with this category, 9,981 had a Date of 3/30/2020, 44 had a Date of 4/20/2020, one had a Date of 5/1/2020 and one had a Date of 6/1/2020. These Dates do not correspond to the move-out dates, but rather appear to be the dates the pro-rata credits were made to the student account. 4,558 students represented by unique Token IDs did not receive any credit in this spreadsheet.

The sum of the values with a Category of Housing-Early Move-Out Credit was $3,873,950.00. Based on the correct 34/113 proration without a 50% discount and without rounding down to the nearest multiple of $10, the sum should have been **$8,310,457.59**, a difference of $4,436,507.59.

Note that GCU provided the approximately $3.9 million for moving out early as a credit to students' accounts, and not as cash refunds. Class Members are not able to choose how to spend the credits (*e.g.*, on renting an apartment or other necessities or paying down student loan debt), but rather are forced to spend credit money with GCU. The credit balance may also reduce the student's eligibility for need-based financial aid, as discussed in the "Credits vs. Cash Refunds" section. GCU should have instead provided Class Members with cash refunds. Therefore, GCU should refund the full $8,310,457.59 in prorated housing fees, rather than the difference between that number and the credits it already provided.

There is insufficient information in the GCU spreadsheet to determine why the remaining 4,558 students did not receive credits. None of the 4,558 students had departure plans that indicated an intent to remain on campus, according to the *GCU-L006605--3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)* spreadsheet. Of those 4,558 students, 2,687 had net housing charges of zero. In many cases, this appears to be due to a room switch adjustment. These students may have been

charged for housing costs for the full year up front, and only show up in this spreadsheet because of the room switch. If the 2,687 students with housing charges of zero were also due refunds, the refunds for these students would total approximately **$2.23 million to $2.28 million** based on the average full refund per student due to the other students.

For example, Token ID 924315977478618 had two transactions on 1/6/2020, one charge for $3,150.00 for North Rim Apts Bldg. 07 Single Occupancy NRA-B07-103-B-Bedroom-Small-A with a transaction date of 5/20/2019 and the other, a credit for ($3,150.00) for Room Switch Adjustment with a transaction date of 12/3/2019. This student was not listed as receiving a credit in this spreadsheet or in the *GCU-L006599 09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY).xlsx* spreadsheet. This is important because it demonstrates that there are thousands of students who did not receive a credit, perhaps because of errors in the method GCU used to identify students who are entitled to a housing refund. These students were included in the spreadsheet only because of the room change transactions.  However, if they paid for and continued to live in on-campus housing after a room change, they are of course owed refunds.

There may be other students who should have received refunds but who do not show up in the spreadsheet at all. For example, students may have paid for the full year of housing up front and not switched rooms, and thus, do not show up in the data for the Spring 2020 semester.

The remaining 1,871 students are potentially entitled to refunds totaling an additional **$1,590,773.07** (an average of $850.23 per student), if they moved out of the housing but weren't provided with a refund.

The total refund due to students is at least $8.3 million and may be as high as $12.2 million (or more). Because the partial credits were not cash refunds, GCU should issue refunds to the students for the full amount due to the students.

The spreadsheet *GCU-L006605--3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)* lists departure plans for 11,829 distinct Token IDs. It shows the amounts of the credits calculated by GCU for each student identified by Token ID. These figures understate the correct amount due from GCU for each student. The aggregated totals according to departure plan are as follows:

| Personal Departure Plan | Count | Credit Amount |
|---|---|---|
| No Response | 287 | No Credit |
| N/A | 7,184 | $2,743,960 |
| Waiver to Remain | 974 | No Credit |
| Plan on leaving/moving out | 3,138 | $1,247,370 |
| Plan on staying | 246 | No Credit |
| TOTAL | 11,829 | $3,991,330 |

The total credits of $3,991,330 shown as being due in this spreadsheet is $117,380 greater than the $3,873,950 total of the Housing-Early Move-Out Credit category in the *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet that

GCU actually provided. Similarly, the 11,829 student count is 1,802 greater than the 10,027 count from this spreadsheet. This yields a significant discrepancy between the two spreadsheets that suggests that many students did not receive the credits that GCU calculated for them and that GCU underpaid $117,380 *even by its own calculation*.

Digging deeper into the discrepancies between the two spreadsheets, there are 46 students represented by Token IDs who were not identified as receiving credits in the Departure Plans spreadsheet, but who received a total of $19,390 in credits in the Ledger Transactions spreadsheet, and 341 Token IDs who were identified as receiving a total of $136,770 in credits in the Departure Plans spreadsheet, but who did not receive credits in the Ledger Transactions spreadsheet. The difference between the two dollar amounts is $117,380, as noted in the previous paragraph. The remaining students did not have matching Token IDs in the two spreadsheets.

The file GCU-L002899--GCU Spring 2020 Housing Credit Policy states, "After all outstanding balances on your student account have been paid, the University will mail you a check in the following applicable amounts depending upon your housing option for the Spring 2020 semester, less any GCU-funded housing scholarships you may have received." GCU does not appear to have mailed checks to the students who did not graduate, but instead provided them with a credit to their student ledger.

It is noteworthy that the housing contract did not include any exceptions for acts of God, pandemics, government action, natural disasters, or other *force majeure* clauses.

Overall, the Class Members are owed housing/room fee refunds of $12.13 million to $12.18 million, which break down as follows:

- Housing/Room Fees for those students who already received a partial housing credit from GCU: $8,310,457.59 (10,027 students were listed as receiving partial housing credits; this calculation is definitive and precise for the listed students)
- Housing/Room Fees for those students who did not receive a partial housing credit from GCU: $2.23 million to $2.28 million (*estimate* for 2,687 students with a net housing charge of zero due to room switch adjustments who were not listed as receiving credits)
- Housing/Room Fees for those students who did not receive a partial housing credit from GCU: $1,590,773.07 (1,871 students with a non-zero net housing charge who weren't provided with a credit)

## Meal Plans

Class Members who lived on GCU's campus were required by GCU to purchase a meal plan, called Dining Dollars, which appear to involve a minimum purchase amount of $750, $1,000, or $1,350, depending on (1) whether the student was a new or returning student, and (2) the residence hall where the student lived. Commuter students were also able to purchase a meal plan but were not required to do so. The minimum amount of Dining Dollars allowed to be purchased by commuter students appears to have been $250.

Because Class Members living on campus were told to vacate their on-campus residence and return to their homes, and all Class Members had their classes moved to an online format, Class Members were unable to thereafter use their Dining Dollars, which only allowed a student to purchase meals or food at on-campus locations. Accordingly, the unused Dining Dollars that the student had remaining in their accounts at the time they were forced off campus by GCU should have been refunded to the students immediately, and not rolled over to a subsequent year as a credit. Rolling over the unused meal plan funds may reduce the student's eligibility for need-based financial aid, as discussed in the "Credits vs. Cash Refunds" section, and it also deprived students of the time-value of their funds. Rollover Dining Dollars are also subject to forfeiture if unused, and so do not represent a real refund.[5]

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 14,600 distinct Token IDs in 22,422 rows for the MEALPLAN BillCode. The Amounts contained in these rows sum to $15,015,262.86. This is the total amount Class Members paid for Dining Dollars for the Spring 2020 semester at GCU.  Of the 14,600 rows, 12,001 have a non-zero Amount. It does not provide any information about the Dining Dollars balances of the students.

There are 1,718 rows with a non-zero MLPNADJ (with a Description of Meal Plan Adjustment, and all but 6 with a Reference of DD Refund). These rows total ($313,036.51). Of these, 218 correspond to Token IDs with a MEALPLAN equal to zero, totaling ($5,317.35). Those rows may involve students who had a MEALPLAN balance from a previous academic year and no new purchase of MEALPLAN credits.

There are 1,500 rows with a Token ID corresponding to a non-zero MEALPLAN totaling $1,537,606.79 that also have a non-zero MLPNADJ totaling ($307,719.16). That's an average adjustment of ($205.15) on an average plan of $1,205.07, a ratio that corresponds to about a 20% refund.

The MLPNADJ was limited to the students who were graduating and was refunded in cash to the graduating students. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, 226:18 to 227:21.)

The spreadsheet does not provide information about the remaining balance of the students who did not graduate. The remaining balance should be refunded to these students, as opposed to rolling them over to a subsequent year, because these students were unable to use their meal plans when they had all classes moved online and/or were told to leave the campus.

Excluding the students who received a MLPNADJ refund leaves a total MEALPLAN of $15,015,262.86 minus $1,537,606.79 (the total MEALPLAN for the graduating students) = $13,477,656.07 (the total MEALPLAN for the students who did not graduate). Assuming 34/113 proration of this total, based on the number of *days* off campus, would yield a refund owed of **$4,055,223.95**. Assuming proration of the *dollars*, similar to the students who did receive cash refunds, would yield a refund owed of **$2,697,319.35**.

---

[5] GCU'S University Policy Handbook Spring 2020, at 153 (GCU000033-000232) states: "Rollover Dining Dollars are not eligible for a refund and are forfeited at the time of graduation or when the student is no longer attending the university. Rollover dining dollars that were forfeited are not available to be reinstated at any time."

The figure based on 34/113 proration is more likely to be accurate because the average Dining Dollars purchased was $895.00 per graduating student compared with $1,046.24 for students who did not graduate.

## Parking

Class Members who purchased on-campus parking were charged and paid Parking Fees that varied in amounts, depending on the student's assigned parking lot or garage and the type of the student's vehicle. The fees also appear to vary depending on whether the student was paying for the full academic year or only the spring semester.

The spreadsheet *GCU-L006607--iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)* lists a total of $1,729,855 in parking fees for 12,182 students.

There are no corresponding transactions listed in the *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* and *GCU-L006599--09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY)* spreadsheets.

The student parking fees show the following patterns.

1. The fees for Campus Resident - - Lot A and Campus Resident - - Lot C (a total of 204 permits) are $50.00, regardless of the date ordered, whether in early fall 2019 or early Spring 2020. These appear to be flat fees regardless of when they were purchased.

2. The fees for Campus Resident (29th Ave Garage, Missouri Garage, Halo Garage, Grove Garage, Oversized Vehicle) and Commuter Student (31st Ave Garage, Oversized Vehicle) are $150 in fall 2019 (10,999 from May 1, 2019 to December 5, 2019) and $75 in spring 2020 (800 from December 9, 2019 to March 27, 2020). The $150 fees were likely for the full academic year and the $75 fees for just the spring semester.

3. In addition, a motorcycle permit cost $100 in fall 2019 (28 from May 2, 2019 to October 20, 2019), $75 in late fall 2019 (2 in October and November 2019) and $50 in Spring 2020 (4 from January 7, 2020 to February 16, 2020).

4. There were a few rows of data that don't match these patterns, such as 31 with fees of $100 for Missouri Garage, 29th Ave Garage, Halo Garage and Grove Garage in fall 2019 (from May 8, 2019 to August 26, 2019), one with fees of $130 for 31st Street Garage on July 30, 2019. These may have been prorated or may have been motorcycle permits that were not labeled as such.

5. There was also one row of data with fees of $15 at 29th Ave Garage on March 12, 2020 and one with fees of $20 at 29th Ave Garage on March 20, 2020, 107 with fees of $30 for 31st Ave Garage, 29th Ave Garage, Halo Garage, Grove Garage and Missouri Garage from August 12, 2019 to April 2, 2020, two with fees of $40 at Halo Garage and 31st Ave Garage on August 9, 2019, and two with fees of $50 at Missouri Garage on July 16, 2019 and October 14, 2019. These may have been short-term parking permits.

Based on the 34/113 proration, the $150 full-year and $75 spring semester fees would require a refund of $22.57 each and the motorcycle permits would require a refund of $15.04 each.

Refunds totaling $267,537.03 are due to 11,865 students [(10,999 + 800) x $22.57 + (28 + 2 + 4) x $15.04 + (31 + 1) x $22.57]. That's 15.47% of the total parking fees in the spreadsheet, affecting 97.4% of the students listed in the spreadsheet.

This total does not include the first and fifth patterns listed above, which represent $13,625 in fees to 317 students. Those represent 0.79% of the total parking fees and 2.6% of the total number of students.

I compared the Token IDs in the *GCU-L006607--iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)* and the *GCU-L006605--3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)* spreadsheets and a total of 888 of the 8,130 students with a Permit Type of Campus Resident were not eligible for a parking refund because they remained in on-campus housing. Of these, 782 had charges of $150, 71 had charges of $75, 2 had charges of $100, 25 had charges of $50 (Lot A or Lot B), 1 had a charge of $50 (motorcycle permit), 6 had charges of $30 and 1 had a charge of $20. Since these students remained in their on-campus housing through the entire Spring 2020 semester, I assume that they are not entitled to refunds of their Parking Fees.  The total refunds that would have been due to these students *had they left campus* is $19,297.33 [(782 + 71) x $22.57 + 3 x $15.04]. By excluding students that remained on campus, the total refunds owed to Class Members for parking fees paid is reduced from $267,537.03 to **$248,239.70.**

## Activity Fee

GCU's Spring 2020 student Activity Fee provided on-campus students access to on campus amenities, such as swimming pools, a bowling alley, game room, recreation centers (including fitness equipment), and an activity center, all of which were not available to students who were required to vacate the campus.[6] The student activity fee also provided free admission to athletic events and theater, music and dance productions, which GCU also cancelled during the Spring 2020 semester. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 150-157; 30(b)(6) Deposition of GCU, Designee Tim Griffin, at 35-37.)

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 24,863 rows with a BillCode of ACTVFEE and a Description of Activity Fee. The BillCode ACTVFEE refers to amounts billed in relation to the Activity Fee paid by Class Members.  (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 174:20-22). These rows correspond to 19,876 distinct Token IDs. The sum of all rows is $4,905,600.00.

When the rows for each Token ID are summed, 7,342 Token IDs have a sum of zero and 17,521 have a sum of 300.00. The Token IDs with a sum of zero have the offsetting transaction with a PostDate that is

---

[6] *See* 30(b)(6) Deposition of GCU, Designee Junette West, at 45:8-47:16.

several months after the PostDate for the initial payment. For example, Token ID "919426947504408"has "300.00" with a PostDate of "7/31/2019" and "(300.00)" with a PostDate of "11/14/2019." None of the rows have a Reference that indicates a refund due to withdrawal. PostDate ranges from 2/17/2019 to 1/24/2020. All have a TermCode of 2020SPRING.

Assuming that the $300.00 activity fee is just for the Spring 2020 semester,[7] 34/113 proration would yield a refund of $90.27 per student. I assume that the Token IDs with a sum of zero were not refunded, but totaled the refunds for them separately for clarity. The total refunds should be $1,581,620.67 for the Token IDs with a sum of 300.00 and $662,762.34 for the Token IDs with a sum of zero, yielding an overall total refund due of **$2,244,383.01** in relation to the Student Activity Fee amounts paid by Class Members.

## Health Fee

The Health Fee provided Class Members with access to a health clinic on campus, which would not be available to students who were required by GCU to vacate the campus or who had no reason to come to campus because all classes moved online.[8]

The Health Fee does not provide health insurance, for which there is a separate, much higher fee. I understand that Plaintiff does not seek a refund of health insurance costs on behalf of himself or the Class Members.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 24,863 rows with a BillCode of HLTHFEE, a Description of Health Fee in the Campus Fee category and a TermCode of 2020SPRING. The BillCode HLTHFEE refers to amounts billed in relation to the Health Fee paid by Class Members. (*See* 30(b)(6) Deposition of GCU, Designee Junette West, at 175:1-5). These rows correspond to 19,876 distinct Token IDs. The sum of all the rows is $1,308,160.00.

When the rows for each Token ID are summed, 3,524 Token IDs have a sum of zero and 16,352 have a sum of 80.00. The Token IDs with a sum of zero have the offsetting transaction with a PostDate that is several months after the PostDate for the initial payment. For example, Token ID "919426947504408" has "80.00" with a PostDate of "7/31/2019" and "(80.00)" with a PostDate of "11/14/2019". PostDate ranges from 2/17/2019 to 1/24/2020. All have a TermCode of 2020SPRING.

Assuming that the $80.00 health fee is just for the Spring 2020 semester, 34/113 proration would yield a refund due of $24.07 per student. I assume that the Token IDs with a sum of zero were not refunded, but totaled the refunds for them separately for clarity. The total refunds are $393,592.64 for the Token IDs

---

[7] Page 152 University Policy Handbook Spring 2020 (GCUL000033-000232) lists the Student Activity Fee as $300 per semester.

[8] *See* 30(b)(6) Deposition of GCU, Designee Junette West, 55:13-18, Ex. 5.

with a sum of 80.00 and $84,822.68 for the Token IDs with a sum of zero, yielding an overall total refund due of **$478,415.32** in relation to Health Fee amounts paid by Class Members.

## Lab Fees

Lab Fees for the Spring 2020 semester were charged by GCU and paid by Class Members enrolled in certain classes. GCU used the Bill_Code of "LABFEE" to identify payments or charges of Lab Fees. Note that LABFEE is distinct from the Bill Code "TUIT", which is the tuition charges for each class. LABFEE would be a supplemental fee related to access to, and use of, a physical lab or studio on GCU's campus, and all of the tools and resources that come with an on-campus lab.

As discussed above, GCU's Spring 2020 University Policy Handbook states that instruction began on January 6, 2020 and ended on April 22, 2020. Accordingly, the proration relevant to Lab Fees, Materials Fees and Course Fees is 31/108.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 24,859 rows with a BillCode of LABFEE with a TermCode of 2020SPRING. These rows correspond to 7,525 distinct Token IDs. The sum of all the rows is $770,700.00. 20,954 (84%) of the rows have a description that includes the word "Lab" in addition to the name of the course (e.g., "General Chemistry I – Lab").

When the rows for each Token ID are summed, 2,591 Token IDs have a sum of zero (corresponding to 4,764 total positive LABFEEs), 2,603 have a sum of 100.00, 1,942 have a sum of 200.00, 336 have a sum of 300.00 and 53 have a sum of 400.00.

Of the rows with negative Amounts, 7,476 have a Reference of UNREG/DROP REFUND, indicating that the student received a refund because they dropped the class. 1,098 have a Reference of Auto-Adjust.

Of the Token IDs with a sum of zero, 1,997 have a Reference of UNREG/DROP REFUND and 594 have a Reference of Auto-Adjust. The latter correspond to a total of 881 negative amounts of (100.00).

The differences in the sums corresponds to the number of courses that have a LABFEE that were taken by the student. The LABFEE appears to be $100.00 per student per course with a lab fee. In other words, students with a LABFEE sum of 500.00 took five classes with an associated lab fee.

31/108 proration of an individual $100.00 LABFEE would yield a refund of $28.70 per LABFEE per student. I assume that the Token IDs with a sum of zero where the student did not drop the class were not refunded, but totaled the refunds for them separately for clarity.

The total refunds are $74,706.10 for the 2,603 Token IDs with a sum of 100.00, $111,470.80 for the 1,942 Token IDs with a sum of 200.00, $28,929.60 for the 336 Token IDs with a sum of 300.00, $6,084.40 for the 53 Token IDs with a sum of 400.00 and $25,284.70 for the 881 Token IDs with a sum of zero (excluding the ones where the student got a refund from dropping the class). This yields an overall total refund due of **$246,475.60** in relation to Lab Fee amounts paid by Class Members.

## Materials Fees

Materials Fees were assessed against certain Class Members as supplemental fees for supplies and materials to be used in in-person classes. Note that MTRLS is distinct from "TUIT", which is the tuition charge for each class.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 161,958 rows with a BillCode of "MTRLS" (representing Materials Fee amounts billed) with a TermCode of 2020SPRING. These rows correspond to 20,083 distinct Token IDs.

The sum of all the rows is $6,094,935.00. Of the rows with negative values, 47,164 have a Reference of UNREG/DROP REFUND, indicating that the student received a refund because they dropped the class. One has a reference of CST-211. 4,796 have a Reference of Auto-Adjust.

When the rows for each Token ID are summed, 3,714 Token IDs have a sum of zero (corresponding to 16,162 total positive MTRLS), 575 have a sum of 105.00, 1,450 have a sum of 210.00, 4,417 have a sum of 315.00, 8,501 have a sum of 420.00, 1,243 have a sum of 525.00, 179 have a sum of 630.00 and 4 have a sum of 735.00. The sums are all multiples of 105.00.

Of the Token IDs with a sum of zero, 2,819 have a Reference of UNREG/DROP REFUND and 895 have a Reference of Auto-Adjust. The latter correspond to a total of 3,080 negative amounts of (105.00). The differences in the sums correspond to the number of courses that have a MTRLS that were taken by the student. The MTRLS appears to be $105.00 per course with a materials fee.

31/108 proration of the MTRLS would yield a refund of $30.14 per Materials Fee charged per student. I assume that the Token IDs with a sum of zero where the student did not drop the class were not refunded, but totaled the refunds for them separately for clarity.

The total Materials Fee refunds due to Class Members, once the Materials Fee amounts are prorated according to the above ration, are $17,330.50 for the 575 Token IDs with a sum of 105.00, $87,406.00 for the 1,450 Token IDs with a sum of 210.00, $399,385.14 for the 4,417 Token IDs with a sum of 315.00, $1,024,880.56 for the 8,501 Token IDs with a sum of 420.00, $187,320.10 for the 1,243 Token IDs with a sum of 525.00, $32,370.36 for the 179 Token IDs with a sum of 630.00, $843.92 for the 4 Token IDs with a sum of 735.00 and $92,831.20 for the 895 Token IDs with a sum of zero (excluding the ones where the student received a refund because they dropped the class). This yields an overall total refund due of **$1,842,367.78** in relation to Material Fee amounts paid by Class Members.

## Course Fees

Class Members were required to pay Course Fees in certain instances. The Course Fees were supplemental fees for clinical, lab, studio and personalized in-person training. Examples include Ballet, Choreography, Dance, Hospitality, Jazz, Nursing Clinical, Practicum, Private Applied Instruction, Private Guitar Study, Private Keyboard Study, Private Percussion Study, Private Piano Study, Private Voice Study, and

Vernacular Dance. Private one-on-one and small group in-person training like this cannot be moved online in an effective manner, so students should be refunded the Course Fee amounts on a pro-rata basis.

The *GCU-L006598--09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))* spreadsheet contains 4,846 rows with a BillCode of "CRSEFEE" (representing Course Fee amounts billed) with a TermCode of 2020SPRING. These rows correspond to 1,877 distinct Token IDs.

Note that CRSEFEE is distinct from TUIT, which is the tuition charges for each class.

This table shows the number of rows for each CRSEFEE Amount.

| Amount | Count |
|---:|---:|
| 50.00 | 521 |
| 60.00 | 673 |
| 70.00 | 1688 |
| 75.00 | 18 |
| 80.00 | 2 |
| 100.00 | 440 |
| 300.00 | 402 |
| 425.00 | 125 |
| (50.00) | 174 |
| (60.00) | 246 |
| (70.00) | 171 |
| (75.00) | 8 |
| (80.00) | 2 |
| (100.00) | 155 |
| (300.00) | 160 |
| (425.00) | 61 |

The sum of all the rows is $278,210.00.

Of the rows with negative values, 929 have a Reference of UNREG/DROP REFUND, indicating that students received refunds because they dropped the class. 48 have a Reference of Auto-Adjust.

When the rows for each Token ID are summed, 374 Token IDs have a sum of zero (corresponding to 555 total positive CRSEFEE). This table shows the counts for each sum.

| Sum | Count |
|---:|---:|
| 0 | 374 |
| 50 | 31 |
| 60 | 407 |
| 70 | 124 |
| 100 | 223 |

| | |
|---|---|
| **120** | 9 |
| **140** | 4 |
| **150** | 13 |
| **200** | 43 |
| **210** | 91 |
| **250** | 23 |
| **280** | 278 |
| **300** | 160 |
| **350** | 4 |
| **360** | 2 |
| **400** | 4 |
| **425** | 29 |
| **500** | 4 |
| **525** | 1 |
| **550** | 3 |
| **600** | 21 |
| **700** | 1 |
| **725** | 13 |
| **775** | 1 |
| **800** | 2 |
| **850** | 1 |
| **900** | 2 |
| **1025** | 1 |
| **1050** | 1 |
| **1075** | 1 |
| **1100** | 2 |
| **1150** | 2 |
| **1225** | 1 |
| **1525** | 1 |

Of the Token IDs with a sum of zero, 341 have a Reference of UNREG/DROP REFUND and 33 have a Reference of Auto-Adjust. The latter correspond to a total of 46 negative amounts of (50.00) to (600.00).

The differences in the sums corresponds to the number of courses that have a CRSEFEE that were taken by the student and the varying CRSEFEE. The CRSEFEE appears to be $50.00 to $425.00 per course with a course fee.

31/108 proration of the CRSEFEE would yield a total refund due of $79,856.57, not counting the Token IDs with a zero sum. The zero sum Token IDs that have a Reference of Auto-Adjust are due a total refund of $1,132.36. This yields an overall total refund due of **$80,988.93** in relation to Course Fee amounts paid

- 17 -

by Class Members. (I assume that the Token IDs with a sum of zero where the student did not drop the class were not refunded, but totaled the refunds for them separately for clarity.)

## Credits vs. Cash Refunds

GCU provided partial credits of some housing fees and meal plan fees paid by some Class Members. Providing an owed refund in the form of a credit, as opposed to cash, does not make Class Members whole because providing credits to students will affect their subsequent eligibility for need-based student financial aid and deprives them of the choice of how to use their funds, as well as the time-value of their money.

In the Higher Education Act of 1965, education-related expenses are used as a cap on the amount of student financial aid students may receive, with the amount of financial aid being directly correlated with a student's "financial need" – the more "financial need" of a student, the more financial aid that student will qualify to receive. Section 471 of the Higher Education Act defines "financial need" as the difference between education-related expenses (the cost of attendance) and the sum of the expected family contribution and estimated financial assistance. Estimated financial assistance is defined by Sections 480(j) and 428(a)(2)(C) of the Higher Education Act[9] as the resources a college is aware of or can anticipate at the time the student aid award is made.

"Financial need" is defined[10] as COA minus EFC minus EFA, where

- "COA" is the cost of attendance, including tuition, fees, books, supplies, equipment, room and board, transportation and miscellaneous personal expenses, along with other costs such as special needs expenses, study abroad, dependent care costs, and the cost of a computer.
- "EFC" is the expected family contribution, a measure of the family's financial strength.
- "EFA" is estimated financial assistance, which includes all scholarships, grants, loans, or other assistance known to the institution at the time the determination of the student's need is made, including national service education awards, but excluding veterans' education benefits, combat pay, education tax benefits, tax-free distributions from 529 plans, prepaid tuition plans and Coverdell education savings accounts.

During the pandemic, the U.S. Department of Education stated that a cash refund is not considered EFA, while a credit (coupon refund) is considered EFA.[11] Thus, a cash refund does not affect eligibility for

---

[9] 20 U.S.C. § 1087vv(j) and § 1078(a)(2)(C), respectively.

[10] For federal student aid purposes, financial need is defined at 20 U.S.C. § 1087kk.

[11] *Is It EFA If a School Delays a Refund Of Institutional Charges Until the Following Academic Year Due To Coronavirus?*, AskRegs, KA-34731, National Association of Student Financial Aid Administrators (NASFAA). https://askregs.nasfaa.org/article/34731/is-it-efa-if-a-school-delays-a-refund-of-institutional-charges-until-the-following-academic-year-due-to-coronavirus

subsequent need-based financial aid, while a credit reduces the amount of need-based aid that the student would otherwise be eligible to receive in a subsequent year.

In addition, GCU appears to have violated the cash management regulations at 34 C.F.R. § 668.164(h)(2), which require payment of a credit balance on the student's account within 14 days unless the student or parent authorizes the college to hold onto the funds (in which case the college must hold cash in the amount of the credit balance in a depository account).

Further, providing funds as credits instead of refunds prevents the students from choosing how to spend their money. The decision whether to spend the funds within the GCU ecosystem or on other expenses (e.g., off-campus rent, computers, paying down debt, other necessities) should have been left to the students. By providing credits rather than refunds, GCU forced students to spend the money within GCU or lose the value of those funds.  In other words, GCU did not refund the money at all, it kept the money it to offset future spending at GCU.

Providing credits for the amounts due to students also ignores the time value of money. Some students may have been forced to charge these expenses mentioned above to credit cards, with interest charged on the credit card balance, or experienced the opportunity cost of spending down interest-bearing savings account balances. Or, maybe a student would have decided not to purchase a meal plan for the next year but for the credit provided which forced the decision. These are just some examples. The point is that the students should have received their funds back as cash refunds to use as they saw fit. The same analysis applies in relation to expenses paid with student loans.

Finally, credit balances may be subject to forfeiture if unused. For example, if the student graduates or withdraws from the university, they cannot receive a refund of their Dining Dollars.

GCU should have issued cash refunds to their students for the Spring 2020 semester, instead of issuing, in some cases, limited credits.

## Qualifications

My opinions are based on my personal experience and expertise as a thought leader in all aspects of planning and paying for college, including student financial aid, student loans, education tax benefits, and saving for college. I have served as publisher of several websites that have helped more than 100 million families plan, save, and pay for college. I have written numerous articles that were published on these websites and in traditional news media. I have personally responded to thousands of questions from consumers, financial professionals, educators and policymakers. I have given talks, both online and in person, on these topics, including Q&A sessions open to the public.

I am President of Cerebly, Inc. (formerly MK Consulting, Inc.), a consulting firm focused on computer science, artificial intelligence and statistical and policy analysis. Cerebly's clients have included the Advisory Committee on Student Financial Assistance (ACSFA), a committee established by Congress to advise it on student financial aid policy. Cerebly also publishes the web site PrivateStudentLoans.guru, among several other web sites.

I previously served as Publisher and Vice President of Research of Saving for College LLC from 2018 through 2020. Saving for College LLC publishes Savingforcollege.com, the most popular guide to planning, saving, and paying for college.  I wrote many articles for Savingforcollege.com and was responsible for the website's 5-cap ratings and performance rankings of 529 college savings plans, 529 plan fee study, college savings plan comparison tools, college savings calculators, and college savings resources for financial professionals. I also edited and updated the *Family Guide to College Savings* and the *Complete Guide to College Savings* books published by Savingforcollege.com.

Before serving as Publisher and VP of Research for Savingforcollege.com, I was Publisher and Vice President of Strategy for Cappex.com LLC from 2016 to 2017. Cappex.com is a free consumer-facing web site about college admissions and financial aid.

Before serving as Publisher and VP of Strategy for Cappex.com, I was Senior Vice President and Publisher of Edvisors Network, Inc. from 2013 to 2015. Edvisors Network, Inc. publishes several consumer-facing web sites, including Edvisors.com, ScholarshipPoints.com and PrivateStudentLoans.com.

Before serving as Senior Vice President and Publisher of Edvisors Network, Inc., I was VP of Advanced Projects for Monster Worldwide and Publisher of FinAid, Fastweb and other consumer-facing web sites owned by Monster Worldwide, from 2001 to 2013. I founded FinAid in 1994. FinAid and Fastweb merged in 1999 and were acquired by Monster Worldwide in 2001.  I designed and implemented all of the calculators on the FinAid web site, including several college savings calculators. I also wrote more than 100,000 lines of SQL code, a computer programming language for accessing and modifying databases, for analyzing Fastweb traffic and revenue data for the purpose of optimizing advertising revenue.

I have also previously worked as a Research Scientist for Just Research, a Software Engineer for the MIT Artificial Intelligence (AI) Laboratory, a Software and Digital Typography Consultant in the Advanced Development Group at Bitstream Inc., and an Assistant Programmer Analyst for the Planning Research Corporation.

I served on the editorial board of the Journal of Student Financial Aid from 2011 to the present. I also served on the editorial board of the Council on Law in Higher Education from 2004 to 2011. I was a member of the board of directors of the National Scholarship Providers Association from 2009 to 2015 and am still a member of their research and advocacy committees.

I have been quoted in numerous newspaper and magazine articles and have written for the New *York Times, Wall Street Journal, Washington Post, Reuters, Huffington Post, U.S. News & World Report, Money Magazine, Bottom Line/Personal, Forbes, Newsweek* and *Time Magazine*. I was named a Money Hero by *Money Magazine* in 2012. I served as the curator for the Student Loans Topics Page for the New York Times from 2009 to 2010. I served as the Student Loan Guru for FiLife.com, a Dow Jones/IAC property, from 2008 to 2010. I have served on the editorial advisory board of various Boardroom Inc. publications, such as Bottom Line/Personal and Bottom Line/Wealth, from 2008 to the present.

I am the author of five bestselling books about student financial aid, including *How to Appeal for More College Financial Aid, Twisdoms about Paying for College*, *Filing the FAFSA* and *Secrets to Winning a*

- 20 -

*Scholarship.* Two of these books won Excellence in Financial Literacy Education (EIFLE) Awards from the Institute for Financial Literacy. My most recent book is *Who Graduates from College? Who Doesn't?*

I have testified before Congress, federal/state agencies and national professional organizations on several occasions, including:

- *Trends in Student Loan Debt*, Keynote Address, NAGTRI/SABA Bankruptcy Seminar, National Association of Attorneys General (NAAG), November 14, 2017.
- *Pay Me Now or Pay Me Later*, College Savings Plan Network Conference, National Association of State Treasurers (NAST), May 13, 2015.
- *The Challenge of Rising Student Loan Debt*, California Student Aid Commission, Symposium on Student Debt, November 14, 2014.
- U.S. Senate Committee on Banking, Housing and Urban Affairs, hearing entitled *Turmoil in U.S. Credit Markets: Impact on the Cost and Availability of Student Loans*, April 15, 2008. My testimony and white paper lead to passage of the Ensuring Continued Access to Student Loans Act of 2008 (P.L. 110-227 and 110-359).

I have written more than 150 student aid policy analysis papers (available at www.studentaidpolicy.com).

I have won numerous awards, including College Financing Ace from *Investment Advisor Magazine*, Excellence in Financial Literacy Education (EIFLE) from the Institute for Financial Literacy, Money Hero from *Money Magazine*, Creative Leadership Award from the California Association of Student Financial Aid Administrators (CASFAA), Special Award from the College Board, the Jefferson Medal from the American Institute for Public Service and a Meritorious Achievement Award from the National Association of Student Financial Aid Administrators (NASFAA). I was named as a Fellow of the National Scholarship Providers Association (NSPA) in 2021. I received the Senator Joseph I. Lieberman Award for Outstanding Achievement in STEM in 2021.

Profiles of me written by journalists include:

- Bernice Napach, Mark Kantrowitz: College Financing Ace — The 2016 IA 25, Investment Advisor Magazine, May 24, 2016.
- Steve Rosen, Expert discusses the rising cost of college and student loan debt, Kansas City Star, May 29, 2015.
- Beckie Supiano, Everybody's Go-To Methodical Mind, Chronicle of Higher Education, July 15, 2013.
- Jane J. Kim, Student-Loan Gadfly Gets a Starring Role as the U.S. Pushes Out the Private Lenders, Wall Street Journal, July 3, 2010.

I earned two Bachelor of Science degrees from the Massachusetts Institute of Technology in 1989, one in mathematics and one in philosophy, and a Master of Science degree in computer science from Carnegie Mellon University in 1991. I am an alumnus of the Rickover Science Institute (RSI) in 1984.

## Prior Testimony

In the last four years, I have testified at trial and/or deposition in the following cases:

- *Dawson vs. Great Lakes Educational Loan Services, Inc. et al.*, Case No. 15-cv-475-JDP, United States District Court for the Western District of Wisconsin.
- *Eric Eberts v. Deborah R. Eberts*, Case No. 07-FA-450, State of Wisconsin Circuit Court, Winnebago County Branch IV.
- *Evan Brian Crocker et al. vs. Navient Solutions, LLC et al.*, Case No. 15-35886, United States Bankruptcy Court for the Southern District of Texas, Houston Division.
- *Homaidan v. Sallie Mae, Inc. et al.*, Case No. 1-17-01085-ESS, United States Bankruptcy Court for the Eastern District of New York.
- Loguidice v. Gerber Life Insurance Company, Case No. 7:20-cv-03254-KMK,United States District Court for the Southern District of New York.
- *Tashanna B. Golden fka Tashanna B. Pearson v. National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-4, GS2 2016-A, Pennsylvania Higher Education Assistance Agency d/b/a American Education Services, Firstmark Services*, Case No. 16-40809 (ESS), Chapter 7, Adv. Pro. No. 17-1005 (ESS), United States Bankruptcy Court for the Eastern District of New York.
- *Troy Orlando Robinson and Anthony W. Spears v. Wells Fargo Bank, N.A., Citibank, N.A., The Student Loan Corporation, Discover Financial Services, Inc., Discover Products, Inc. et. al.*, Case No. 11-80896, United States Bankruptcy Court for the District of Nebraska.

## Documents Reviewed

- Ledger Card for Carson J. Little (GCU-L000030-32)
- GCU-L002899—GCU Spring 2020 Housing Credit Policy
- GCU-L002900—Pro Rata Refund COVID-19 Room  board fees 2019- 2020
- GCU-L006598—09.22.2021 Ledger Transactions_Bill Codes_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY))
- GCU-L006599—09.22.2021 Ledger Transactions_Payments_2020SPRING (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY)
- GCU-L006602—FINAL CARES Reconciliation FY 2021 (Tokenized) (CONFIDENTIAL-ATTY EYES ONLY)
- GCU-L006605—3.27 UPDATED All Student Personal Departure Plans and Credit amount (Tokenized)
- GCU-L006607—iPark Parking Permits Purchased 2019_2020 (Tokenized) (CONFIDENTIAL)
- Little Housing Contract Email  (PL000346-000348)
- University Calendar for Spring 2020
- 2019-2020 University Policy Handbook Spring (GCU-L000033-000232)
- Class Action Complaint
- Grand Canyon University's Answer to Complaint

- Carson Little Enrollment and Finance Agreement (GCU-L002277-002291)
- Housing Policies (PL001596-001603)
- 30(b)(6) Deposition of GCU, Designee Junette West Deposition Transcript and Exhibits 1 through 19
- Junette West Individual Deposition Transcript
- 30(b)(6) Deposition of GCU, Designee Tim Griffin, Deposition Transcript, and Exhibits 1 through 13

Signature

Date 1/19/2023